**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CILAG GMBH INTERNATIONAL, a Swiss corporation; and JANSSEN BIOTECH, INC., a Pennsylvania corporation, <br><br> *Plaintiffs,* <br><br> v. <br><br> HOSPIRA WORLDWIDE, LLC, a Delaware corporation f/k/a/ Hospira Worldwide, Inc.; HOSPIRA, INC., a Delaware corporation, <br><br> *Defendants.* | Civil Action No. 1:22-CV-00589-RGA <br><br> **PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

OF COUNSEL:

William F. Cavanaugh
Jonathan H. Hatch
Alejandro H. Cruz
Patterson Belknap Webb & Tyler
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-7625
Facsimile: (212) 336-1269
Email: wfcavanaugh@pbwt.com
      jhatch@pbwt.com
      acruz@pbwt.com

Mark A. Neubauer
Steven B. Weisburd
Carlton Fields LLP
2029 Century Park East, Suite 1200
Los Angeles, CA 90076
Telephone: (310) 843-6300
Facsimile: (310) 843-6301
Email: mneubauer@carltonfields.com
      sweisburd@carltonfields.com

Beth Moskow-Schnoll (Del. No. 2900)
Brittany Giusini (Del. No. 6034)
BALLARD SPAHR LLP
919 North Market Street, 11th Floor
Wilmington, Delaware 19801-3034
Telephone: (302) 252-4465
Facsimile: (302) 252-4466
   Email: moskowb@ballardspahr.com
      giusinib@ballardspahr.com

*Attorneys for Plaintiffs Cilag GmbH International
and Janssen Biotech, Inc.*

Dated: August 1, 2022

**TABLE OF CONTENTS**

<u>Page</u>

TABLE OF AUTHORITIES ............................................................................. ii

SUMMARY OF ARGUMENT ........................................................................1

STATEMENT OF FACTS ...............................................................................3

      A.     ReoPro..........................................................................................3

      B.     Hospira Committed to Meet Worldwide Sales Demand for ReoPro ......................4

      C.     Janssen Is a Party to the DSA and an Intended Beneficiary of the DSA ................5

      D.     Cilag Bargained to Ensure a Continuous Supply of ReoPro ...................6

      E.     The Quality Technical Agreement Further Specifies Hospira's Responsibilities ................6

      F.     The Parties Reserved All Remedies Under the DSA to Compensate for a Breach ................7

      G.     Hospira Breaches Its Obligations to Plaintiffs ................8

STANDARD OF REVIEW .............................................................................9

ARGUMENT ................................................................................................10

I.      PLAINTIFFS MAY SEEK LOST PROFITS ....................................10

II.     JANSSEN HAS STANDING TO ENFORCE THE DSA............................15

      A.     Janssen Is a Party to the DSA ................................................15

      B.     Janssen Alternatively Qualifies as a Third-Party Beneficiary of the DSA ............16

             1.     The parties intended for Janssen Biotech to benefit from the DSA..........16

             2.     The intended benefit was in satisfaction of Cilag's pre-existing obligation to Janssen Biotech................17

             3.     Benefiting Janssen was a material aspect of the DSA ..............18

III.    PLAINTIFFS' CLAIMS THAT HOSPIRA BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING MUST PROCEED ..............19

IV.    HOSPIRA'S MOTION SHOULD BE DENIED BECAUSE PLAINTIFFS' INTERPRETATION OF THE DSA IS REASONABLE................20

CONCLUSION................................................................................................20

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Animal Science Products, Inc. v. China Minmetals Corp.*,
    654 F.3d 462 (3d Cir. 2011)...........................................................................9

*Ashcroft v. Iqbal*,
    556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)........................................9

*Biotronik v. Conor Medsystems*,
    22 N.Y.3d 799 (2007) ...........................................................................12, 14

*CHS/Community Health Sys. v. Steward Health Care Sys. LLC*,
    2020 Del. Ch. LEXIS 271 (Del. Ch. Aug. 21, 2020).....................................9, 10, 20

*Coca-Cola Bottling Co. v. Coca-Cola Co.*,
    769 F. Supp. 671 (D. Del. 1991) ..............................................................11

*Comrie v. Enterasys Networks, Inc.*,
    837 A.2d 1 (Del. Del. Ch. 2003) ................................................................12

*CrewFacilities.com, LLC v. HotelEngine, Inc.*,
    2021 U.S. Dist. LEXIS 119769 (D. Del. June 28, 2021)..........................................14

*Del. & Hudson Ry. Co. v. Knoedler Mfrs., Inc.*,
    781 F.3d 656 (3d Cir. 2015)..........................................................................3

*Dunlap v. State Farm Fire & Cas. Co.*,
    878 A.2d 434 (Del. 2005) ...........................................................................19, 20

*Eastman Chem. Co. v. Alphapet Inc.*,
    2011 U.S. Dist. LEXIS 158477 (D. Del. Nov. 18, 2011) .........................................17

*Ecolab Inc. v. SC Johnson Prof'l Grp. Ltd. (F/K/A Deb Grp. Ltd.)*,
    2022 U.S. Dist. LEXIS 78867 (D. Del. Apr. 18, 2022)....................................10, 20

*eCOMMERCE Indus. v. MWA Intelligence, Inc.*,
    2013 Del. Ch. LEXIS 245 (Del. Ch. Sep. 30, 2013)........................................12, 13

*Emerald Capital Advisors Corp. v. Karma Auto. LLC (In re FAH Liquidation
    Corp.)*,
    581 B.R. 98 (Bankr. D. Del. 2017) ............................................................10, 20

*Gardensensor, Inc. v. Stanley Black & Decker, Inc.*,
    2014 U.S. Dist. LEXIS 135302 (N.D. Cal. Sep. 24, 2014) .....................................13

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Hall v. Associated Int'l Ins. Co.*,
   2011 U.S. Dist. LEXIS 84399 (D. Kan. Aug. 1, 2011.) ........................9

*IMS Health, Inc. v. Vality Tech., Inc.*,
   2000 U.S. Dist. LEXIS 8635 (E.D. Pa. June 22, 2000) ........................20

*In re Adi Liquidation, Inc.*,
   555 B.R. 423 (Bankr. D. Del. 2016) ........................13

*In REI Holdings, LLC v. LienClear - 0001, LLC*,
   2019 U.S. Dist. LEXIS 130285 (D. Del. Aug. 5, 2019) ........................20

*Micro Focus (US), Inc. v. Ins. Servs. Office, Inc.*,
   2022 U.S. Dist. LEXIS 85846 (D. Del. May 12, 2022) ........................17

*NAMA Hldgs., LLC v. World Mkt. Ctr. Venture*,
   LLC, 948 A.2d 411 (Del. Ch. 2007), *aff'd*, 945 A.2d 594 (Del. 2008) ........................10

*Phillips v. Cnty. of Allegheny*,
   515 F.3d 224 (3d Cir. 2008) ........................9

*S. Track & Pump, Inc. v. Terex Corp.*,
   623 F. Supp. 2d 558 (D. Del. 2009) ........................19

*Tractebel* v. *AEP Power Marketing*,
   487 F.3d 89 (2d Cir. 2007) ........................13

*United Health All., Ltd. Liab. Co. v. United Med., Ltd. Liab. Co.*,
   2014 Del. Ch. LEXIS 233 (Del. Ch. Nov. 20, 2014) ........................16, 18, 19

**Statutes and Rules**

28 U.S.C § 1332 ........................9

Fed. R. Civ. P. 12 ........................9

**Other Authorities**

Restatement (Third) of Agency §6.01 ........................4, 15

Plaintiffs Cilag GmbH International ("Cilag") and Janssen Biotech, Inc. ("Janssen") (collectively, "Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants Hospira Worldwide LLC's and Hospira, Inc.'s (collectively, "Hospira" or "Defendants") partial motion to dismiss.

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

On April 28, 2022, Plaintiffs filed this breach of contract action in the Superior Court for the State of Delaware. On May 2, 2022, prior to service of the summons and Complaint, Defendants removed this action to this Court based on diversity jurisdiction pursuant to 28 U.S.C § 1332(a). On July 1, 2022, Hospira moved to dismiss the Complaint to the extent it seeks damages for lost profits, as well as Counts 2, 3, and 4 in their entirety.

## SUMMARY OF ARGUMENT

Having breached its contractual obligations and right to be the exclusive, worldwide supplier to Plaintiffs for ReoPro, Hospira argues that Plaintiffs have no remedy for the substantial profits lost as a result of this breach. Hospira is wrong. Nothing in the 2006 Development and Supply Agreement (the "DSA" or "Agreement") precludes Plaintiffs from seeking lost profit damages attributable to Hospira's failure to supply ReoPro following the FDA identifying numerous issues at Hospira's production facility and Plaintiffs identifying numerous defective lots of ReoPro.

Hospira does not deny any of these manufacturing failures in its motion. Nor does Hospira deny that these failures gutted Plaintiffs' ability to sell a product that had, for years, provided a steady stream of revenue to both Plaintiffs and Hospira. Instead, it misinterprets key provisions in the DSA in an attempt to shield itself from the direct and necessary consequences of its conduct and deny Plaintiffs a remedy for their damages.

1.   Hospira's reliance on Section 8.6 of the DSA is misplaced.  The parties to the DSA were sophisticated and knew how to exclude a category of damages wholesale.  Had the parties intended to exclude "lost profits" as a remedy in all circumstances, they would have, see DSA § 6.8 (excluding "lost profit" damages in the case of a recall only), but they did not.  And the mere exclusion of "consequential damages" in Section 8.6 does not bar the lost profits sought here.  As Delaware courts have recognized, lost profit damages can be direct or consequential, depending on their nature.  Here, they are direct.  The material purpose of the DSA was to enable Plaintiffs to sell ReoPro, and for Hospira to act as the exclusive supplier of the product to Plaintiffs.  Plaintiffs could not sell ReoPro without Hospira performing, and Hospira could not earn any revenue from ReoPro absent sales by Plaintiffs.  Plaintiffs' profits from sales of ReoPro flowed directly from that bargain.  To hold otherwise would leave Plaintiffs without any remedy for Hospira's breach.

2.   Janssen has standing to seek its lost profits given its central role in the sale and distribution of ReoPro.  Cilag, as Janssen's agent, bound Janssen to the DSA, which contains multiple provisions in which Hospira recognized its contractual obligation to supply ReoPro to Cilag's Affiliates and Licensees.  And the DSA further provides that Cilag was specifically acting on behalf of Janssen's predecessor entity to bind it to the Agreement's rights and obligations.  Given these provisions, Janssen is a party to the DSA and the Court need not reach the question of whether Janssen is a third-party beneficiary.  But Janssen also would unquestionably qualify as a third-party beneficiary under Delaware law.  The DSA explicitly states that Hospira was acting to fulfill Cilag's requirements, as well as those of its "Affiliates."  This and other provisions confirm that Cilag and Hospira intended to materially benefit Janssen and other

2

Affiliates, and the Complaint (as well as the DSA) make clear that those benefits were to fulfill Cilag's prior obligations to Janssen.

3.   Plaintiffs' claims for breach of the implied covenant of good faith and fair dealing are not duplicative of Plaintiffs' contract claims.  To be sure, Hospira's conduct has breached multiple provisions of the DSA.  But Hospira's bedrock obligation under the DSA was to provide a continuous and reliable supply of ReoPro to meet worldwide market demand.  The duty of good faith and fair dealing exists to prevent a party from fundamentally undermining the purpose of a specific obligation implied in an agreement, and fully applies here.

4.   Absent Hospira demonstrating that no reasonable person could read the DSA as Plaintiffs do—and it cannot—Hospira's motion should be denied in its entirety and discovery, including on any potential contractual ambiguities, should proceed.[1]

## STATEMENT OF FACTS

### A.   ReoPro

ReoPro is a medication administered to patients during coronary procedures to prevent narrowing of the arteries and related complications.  Compl. ¶ 13; DSA at 1.  It was developed by Centocor, Inc. in the early 1990s.  Johnson & Johnson ("J&J") acquired Centocor in 1999, and Centocor was thereafter renamed Janssen Biotech, Inc. as part of J&J's pharmaceutical sector of healthcare companies.  Compl. ¶ 13 n.2.  ReoPro was approved for use in 47 countries, including the United States.  *Id.*

Since 2016, Janssen has been responsible for selling ReoPro in the United States, the largest market for ReoPro.  Prior to that time, Eli Lilly, as a licensee of Janssen, had the right to

---

[1] To the extent this Court holds that Plaintiffs did not adequately plead Janssen's status as an intended third-party beneficiary (or any element of any claim alleged in the Complaint), Plaintiffs request leave to amend to provide additional details and information.  *See e.g., Del. & Hudson Ry. Co. v. Knoedler Mfrs., Inc.*, 781 F.3d 656, 660 (3d Cir. 2015).

sell and distribute ReoPro.  Plaintiffs are subsidiaries of J&J.  *Id*. ¶¶ 6–7.  Within the J&J family

of companies, Cilag has long been the company responsible for securing third-party

manufacturing services on behalf of itself and other J&J pharmaceutical companies, including

Centocor and its successor, Janssen.  Cilag was responsible for entering into agreements with

third-party manufacturers to satisfy the worldwide demand for ReoPro, which was sold by,

among other parties, Janssen.  *Id*. ¶¶ 13–14.  Throughout the relevant time period, Cilag

contracted to provide its Affiliates, including Janssen and its predecessors, with all of the ReoPro

necessary to satisfy demand.  *Id*.  Supplying ReoPro for worldwide sales was Cilag's sole

material purpose in entering the Agreement with Hospira to manufacture and supply ReoPro.  *Id*.

¶¶ 20, 55.

## B.     Hospira Committed to Meet Worldwide Sales Demand for ReoPro

On May 1, 2006, in order to satisfy Cilag's obligations to its Affiliates, including Janssen,

Cilag and Hospira executed the DSA.  *Id*. ¶ 15.  In the DSA, Hospira committed to being the

exclusive manufacturer of ReoPro in order to allow Cilag to meet its obligation to Janssen, and

other Affiliates, and Licensees.  *Id*. ¶¶ 15, 23–25; DSA § 5.1.  Hospira also promised to

manufacture and supply ReoPro in accordance with current good manufacturing practices

("cGMP").  *Id*. ¶¶ 22, 27; DSA § 6.1.  In return, Cilag promised that Hospira would be the

exclusive worldwide provider of manufacturing services for ReoPro (up to 1,500,000 vials), and

that Cilag or one of its Affiliates would provide Hospira with the active ingredient necessary to

manufacture its ReoPro requirements.  *Id*. ¶¶ 15, 21; DSA § 5.1.

The DSA expressly provided that Affiliates of Cilag would be involved in meeting

Cilag's obligations under the DSA, including assisting Hospira to qualify its manufacturing

facility in McPherson, Kansas (the "Hospira Facility") as an approved pharmaceutical

manufacturing site.  *Id*. ¶ 19–20; DSA §§ 2.1, 5.1.  Once those requirements were met, Hospira

was obligated to deliver market-ready ReoPro to Cilag, its Affiliates, and Licensees so that they could meet market demand.  *Id*.

## C.  Janssen Is a Party to the DSA and an Intended Beneficiary of the DSA

Janssen was not a stranger to the DSA.  Under the DSA, Janssen is an Affiliate of Cilag for whom Hospira is obligated to provide ReoPro.  *Id*. ¶¶ 7, 17–18; DSA §§ 1.1, 8.1(f).  Section 1.1 of the DSA defines Affiliate, in relevant part, as "any corporation or non-corporate business entity which controls, is controlled by, or is under common control with a party to this Agreement."  Further, Janssen's predecessor, Centocor, Inc., is expressly identified as an "Affiliate" in the DSA.  *See* DSA § 8.1(f); *see also* Compl. ¶ 7 n.2.  As part of the J&J pharmaceutical sector, Cilag entered into the DSA, in part, to satisfy its pre-existing duty to Centocor and, thereafter, Janssen to manufacture and supply ReoPro, an obligation Cilag took on prior to its execution of the DSA as part of its role within the J&J pharmaceutical sector.  *Id*. ¶ 18; *see also supra* at 3–4.  Critically, it was material to and explicit in the DSA that Cilag acted on behalf of and was authorized to bind its Affiliates to the terms of the DSA:

> [Cilag warrants that it has] right to bind its Affiliates to the
> terms of this Agreement and that it shall be fully responsible for
> the acts and omissions of its Affiliates as if such acts and omissions
> were the acts and omissions of [Cilag].  [Cilag] represents and
> warrants that Global Biologics Supply Chain, LLC and Cenotcor,
> Inc. [sic] are Affiliates of the Company as that term is defined in
> this Agreement.  DSA § 8.1(f).

The parties explicitly acknowledged that "Hospira [] shall Manufacture and deliver Product to Company for commercial sale by [Cilag], ***its Affiliates*** and the Licensees" DSA § 2.1 (emphasis added).  The parties further agreed that Hospira "shall Manufacture, sell and deliver Product to Company, and Company shall purchase and take delivery of its ***and its Affiliates*** . . . total worldwide requirements" of ReoPro.  DSA § 5.1 (emphasis added).  In addition, the DSA confers other rights and obligations on Affiliates of Cilag.  *See, e.g*., DSA § 4.1 ("Hospira shall

consult with and advise [Cilag] and its Affiliates' submission(s) for [ReoPro]").  Hospira also

expressly agreed to indemnify Affiliates and provide sufficient insurance for them.  *See* DSA

§ 8.3 (indemnification); § 12.9 (insurance).

**D.    Cilag Bargained to Ensure a Continuous Supply of ReoPro**

Under the DSA, Hospira was the exclusive manufacturer of ReoPro for Plaintiffs.

Plaintiffs had no other options for meeting worldwide demand if Hospira failed or refused (as it

eventually did) to manufacture ReoPro.  Compl. ¶¶ 26, 54; *see* DSA § 10.1.  Setting up a

production line for a biologic product like ReoPro is complex and time consuming.  As Plaintiffs

knew, qualifying a line was likely to take at least two years.  *Id*. ¶¶ 1, 26.  In representing that it

had the capacity to fulfill Plaintiffs' worldwide needs, Hospira represented that it was willing and

able to fulfill those needs.  *Id*. ¶¶ 1, 26, 54.  Hospira knew that if it did not, Plaintiffs would be

left without a source of ReoPro for the time it would take to qualify an alternative line.  *Id*.

**E.    The Quality Technical Agreement Further Specifies Hospira's Responsibilities**

Hospira's obligations under the DSA—specifically, Hospira's technical obligations

regarding resources, manufacturing, and quality control at the Hospira Facility—were further

delineated in a Quality Technical Agreement ("QTA") in 2006, which was incorporated by

reference into the DSA.  *See* Compl. ¶ 32; DSA § 6.3.  As of 2017, the parties to the DSA

amended the QTA to further clarify the technical requirements imposed on Hospira under the

DSA.  *Id*. ¶¶ 33–35.

Hospira was a party to the amended QTA, along with "Janssen, Inc," another J&J

subsidiary in the J&J pharmaceutical sector.  *Id*.  The QTA aimed to ensure "the manufacture,

quality control, and release of [ReoPro that] complies with good manufacturing practices."  *Id*.

Part of Hospira's obligation under the QTA was to "provide adequate resources, including the

assignment of trained personnel, in order to . . . manufacture the requested quantities of [ReoPro]

conf[o]rming with the specified requirements." *Id*. ¶ 37; QTA § 9.2.  Hospira also committed to a robust set of requirements to ensure high quality, unadulterated medication.  *Id*. ¶ 38.

**F.      The Parties Reserved All Remedies Under the DSA to Compensate for a Breach**

Hospira manufactured and supplied ReoPro so that Cilag and its Affiliates, including Janssen, could sell it.  Compl. ¶¶ 20, 55; DSA § 2.1.  That was the DSA's sole purpose.  *Id*. ¶ 61.  Plaintiffs took in revenue on each vial of ReoPro sold into the worldwide market; Hospira's supply of ReoPro to Cilag would grow as increasing market sales drove Cilag's forecasts for future demand.  *Id*. ¶¶ 23–24, 61.  If Hospira were to breach its obligations to manufacture and supply ReoPro to meet worldwide demand—and it did—absent a remedy based on lost sales, Plaintiffs would be left with no remedy at all under the DSA.  *Id*. ¶¶ 28, 55.

For that reason, the parties agreed that "[e]xcept as expressly set forth in this Agreement, none of the remedies set forth in this Agreement are intended to be exclusive, and each party shall have available to it all remedies available under law or in equity."  DSA §12.14.  Section 8.6 of the DSA, entitled "No Consequential Damages," does set forth certain limited exclusions as to the type of remedies available to the parties:

> NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES RESULTING FROM ANY BREACH OF THIS AGREEMENT EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

But nowhere in § 8.6 is there a limitation on damages based on lost profits.  To the contrary, those remedies necessarily included lost profits because, otherwise, there would be no meaningful expectation damages available in the case of Hospira's breach.  *See* Compl. ¶¶ 55, 62.  On the other hand, the parties specifically addressed lost profits as a category of damages in

7

Section 6.8, which expressly precluded them as recoverable in the event of a product recall covering ReoPro. *See* DSA § 6.8; Compl. ¶ 29.  This case does not involve a product recall.

## G.      Hospira Breaches Its Obligations to Plaintiffs

Between 2006 and 2016, Hospira performed under the DSA.  Compl. ¶¶ 2, 3.  But in 2017, Hospira was required to shut down production of ReoPro to remediate pervasive quality control issues at the production facility.  *Id*. ¶¶ 40, 44.  In a February 2017 Warning Letter from the FDA to Hospira, the FDA identified "significant violations of current good manufacturing practice regulations for finished pharmaceuticals."  *Id.* ¶ 40.  Based on those findings, and others, the FDA informed Hospira that its "drug products," including ReoPro, were "adulterated."  *Id*. Subsequently, multiple deliveries of ReoPro to Janssen were rejected for quality concerns, including confirmed contamination with "particulate matter."  *Id*. ¶ 42.  The conditions at the Hospira Facility, as well as Hospira' failures to deliver unadulterated ReoPro, were clear breaches of Hospira's obligations under both the DSA and the QTA.

Shortly after the shutdown of the Hospira Facility, Hospira stopped supplying ReoPro to Cilag and its Affiliates, including Janssen.  *Id.* ¶ 45–46.  In June 2018, Hospira gave notice that it would terminate the DSA as of December 31, 2020.[2]  In breach of its commitments under the DSA, however, Hospira did not supply ReoPro between 2018 and 2020.  *Id*.  As of 2018, with no supply of ReoPro to sell and no ability to cover, Plaintiffs were unable to meet the market demand it had previously been able to satisfy.  *Id*.  Plaintiffs were forced to discontinue worldwide sales of ReoPro and advise the medical community that it would be unable to meet demand for this coronary drug.

---

[2] The existing agreement expired on December 31, 2020.  Section 10.1 of the DSA provided for the automatic extension of the contract's terms for one-year terms, absent notice of termination.

Hospira's breaches caused Plaintiffs substantial losses.  *Id.* ¶¶ 50–52.  Not only were
Plaintiffs saddled with the sunk costs of active ingredient and other raw materials that they were
obligated to provide to Hospira under the DSA, Plaintiffs were entirely unable to meet the needs
of doctors wanting to prescribe ReoPro for their patients.  *Id.* ¶¶ 51–52.  In the years immediately
preceding the shutdown of the Hospira Facility, Plaintiffs' profits from selling the ReoPro
exclusively manufactured by Hospira ranged from $40 million to nearly $57 million annually.
*Id.*  Hospira's inability to manufacture ReoPro directly caused a loss of those profits because
there was no alternative source to secure ReoPro.  Hospira had the exclusive manufacturing right
and it takes years—and substantial financial investment—to set up and gain regulatory approval
for an alternative facility to make a finished biologic product like ReoPro.

## STANDARD OF REVIEW

On a motion to dismiss, this Court is "required to accept as true all factual allegations in
the complaint and draw all inferences . . . in the light most favorable to" Plaintiffs.  *See Phillips
v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).  "To survive a motion to dismiss, a
complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that
is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868
(2009) (citing *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the pleaded
factual content allows the court to draw the reasonable inference that the defendant is liable for
the misconduct alleged." *Id.*  This "plausibility standard . . . is not akin to a 'probability
requirement.'" *Id.*  To the contrary, the moving party bears the burden of showing that no claim
has been stated.  *Animal Science Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n. 9
(3d Cir. 2011).[3]

---

[3] Plaintiffs also purport to move for dismissal of Janssen's claims under the DSA for lack of
subject matter jurisdiction under Rule 12(b)(1).  Standing to bring suit under a contract, however,

Dismissal of claims for breach of a contract is only appropriate if the defendant's interpretation of the contract is the sole reasonable interpretation. *See CHS/Community Health Sys. v. Steward Health Care Sys. LLC*, 2020 Del. Ch. LEXIS 271, at *5–6 (Del. Ch. Aug. 21, 2020); *see also Ecolab Inc. v. SC Johnson Prof'l Grp. Ltd. (F/K/A Deb Grp. Ltd.)*, 2022 U.S. Dist. LEXIS 78867, at *6–7 (D. Del. Apr. 18, 2022). If the provisions in controversy are reasonably or fairly susceptible to different interpretations, a court "cannot choose between two differing reasonable interpretations" at the motion to dismiss stage. *Emerald Capital Advisors Corp. v. Karma Auto. LLC (In re FAH Liquidation Corp.)*, 581 B.R. 98, 107 (Bankr. D. Del. 2017); *CHS/Community Health*, 2020 Del. Ch. LEXIS 271, at *5–6.

## ARGUMENT

## I.   PLAINTIFFS MAY SEEK LOST PROFITS

Nothing in the DSA precludes Plaintiffs from seeking lost profit damages for Hospira's failure to supply ReoPro. Defendants' reliance on Section 8.6 is misplaced.[4] The DSA says nothing in Section 8.6 to limit lost profits as direct damages. Moreover, the parties agreed that "[e]xcept as expressly set forth in this Agreement, none of the remedies set forth in this DSA are intended to be exclusive, and each party shall have available to it all remedies available under law or in equity." DSA § 12.14.

When the parties to the DSA sought to exclude lost profit damages as a potential remedy, they knew how to do it. In the specific case of a product recall, the DSA provides that Cilag

_____

is distinct from this Court's subject matter jurisdiction to adjudicate this case. Accordingly, all of Defendants' arguments, including those as to whether Janssen can enforce a remedy under the DSA, are merits issues that this Court must address under Rule 12(b)(6). *See Hall v. Associated Int'l Ins. Co.*, 2011 U.S. Dist. LEXIS 84399, at *5–7 (D. Kan. Aug. 1, 2011.)

[4] Hospira does not move to dismiss Plaintiffs' claims to the extent they seek to recover the cost of active ingredient and other materials that expired or went unused by Plaintiffs as a result of Hospira's breaches. *See* Compl. ¶ 3.

would not be entitled to lost profits and would only be entitled to the costs of the recall.  *See* DSA § 6.8; Compl. ¶ 29.  If Hospira were correct that Section 8.6's reference to "consequential damages" includes lost profit damages, Section 6.8's reference to "lost profits" in the case of a recall would be entirely superfluous.  *See NAMA Hldgs., LLC v. World Mkt. Ctr. Venture*, LLC, 948 A.2d 411, 419 (Del. Ch. 2007), *aff'd*, 945 A.2d 594 (Del. 2008) ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court.").  When Sections 6.8, 8.6, and 12.4 are read together, it is clear that outside of the context of a product recall, Plaintiffs' rights to lost profits damages based on the breaches alleged in the Complaint are preserved, and Hospira's attempts to write them out of the DSA are unavailing.  *See e.g., Coca-Cola Bottling Co. v. Coca-Cola Co.*, 769 F. Supp. 671, 707 (D. Del. 1991) ("Courts do not rewrite contracts to include terms not assented to by the parties.") (quotations omitted).  To the extent the parties to the DSA intended to limit their remedies under the DSA, including as to "lost profits," they did that in Section 6.8 in relation to product recalls, and refrained from making a similar exclusion in Section 8.6 for other breaches.

Defendants nonetheless argue that excluding recovery of "lost profits" in the case of a product recall but allowing Cilag to recover lost profits here "makes no sense."  Opp. Br. at 12. To the contrary, it makes perfect sense.  The parties to the DSA explicitly precluded recovery of lost profits as a category of "costs" of a recall where a batch or multiple discrete batches were disallowed from sale under circumstances (*i.e.*, a recall) that may have been out of the parties' control (*e.g.*, a side effect associated with use of the drug).  On the other hand, in the absence of circumstances involving a potential defect, the parties allowed for recovery of all direct damages, whether or not attributable to the "costs" of a recall.

Notwithstanding the absence of a lost profits' exclusion in Section 8.6, Defendants argue that the preclusion of "consequential damages" implicitly precludes lost profit damages. *See* Opp. Br. at 8. Defendants claim this precludes "downstream consequential damages such as hypothetical lost profits on ReoPro sales." *Id*. But there is nothing "hypothetical" about Plaintiffs' damages. Defendants do not dispute that they failed to perform under the DSA. Nor do they dispute that Plaintiffs have sufficiently pled damages—in the form of lost profits— caused by Hospira's non-performance.

Defendants' focus instead on their assertion that this Court should hold—prior to any discovery as to the parties' expectations or intent regarding damages—that as a matter of law Plaintiffs' lost profits constitute "consequential" damages. *Id*. Courts in Delaware, however, recognize the common-sense rule that lost profits can be direct damages for a material breach, especially where, as here, the non-breaching party would be left with no expectation remedy without an award based on lost profits. *See eCOMMERCE Indus. v. MWA Intelligence, Inc*., 2013 Del. Ch. LEXIS 245, at *159 (Del. Ch. Sep. 30, 2013).

"The standard remedy for breach of contract is based upon the reasonable expectations of the parties *ex ante*. This principle of expectation damages is measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract." *Comrie v. Enterasys Networks, Inc*., 837 A.2d 1, 17 (Del. Del. Ch. 2003). Consequential damages, on the other hand, are those damages that flow indirectly from the parties' reasonable expectations. *See eCommerce*, 2013 Del. Ch. LEXIS 245, at *159. Lost profit damages are not consequential damages when "profits are precisely what the non-breaching party bargained for, and only an award of damages equal to lost profits will put the non-breaching party in the same position he would have occupied had the contract been performed." *Id*. at *160 (citing *Tractebel*

12

v. *AEP Power Marketing*, 487 F.3d 89, 109–10 (2d Cir. 2007)); *see also Biotronik v. Conor Medsystems*, 22 N.Y.3d 799, 803 (2007) (holding that lost profits were direct damages under a supply agreement).

In *eCommerce*, one party sought to recover lost profits as damages for breach of a non-compete provision in a licensing agreement.  2013 Del. Ch. LEXIS 245, at *158–60.  Defendants argued that lost profits were not recoverable because the contract explicitly prohibited recovery of "consequential damages" in a provision that—unlike the DSA—explicitly included "lost revenue or profits."  *Id*.  Nonetheless, the court found that "[b]ecause lost profits are the type of damage most likely to result from a breach of a non-compete provision, I consider lost profits to be in the nature of direct damages in this case."  *Id*.  The court further held that "the issue here is whether the limitation on 'consequential damages' effectively bars [plaintiff] from recovering any damages whatsoever."  *Id*.  The *eCommerce* court answered no, rejecting the argument that the liability limitation clause precluded recovery of all lost profits.[5]  *Id*.; *see also Tractebel*, 487 F.3d at 109–10.

Defendants' reliance on *In re Adi Liquidation, Inc*., 555 B.R. 423 (Bankr. D. Del. 2016), for the proposition that lost profits constitute consequential damages as a matter of law misses the mark.  Opp. Br. at 12.  That case involved a motion for summary judgment under New York's implementation of the Uniform Commercial Code.  *See* 555 B.R. at 432.  None of those factors are present here.  Moreover, the *Adi* court focused its reasoning on a specific provision of the

---

[5] While *eCommerce* involved a breach of a non-compete clause, courts applying *eCommerce* have rejected the suggestion that its holding should be limited to that context.  *See, e.g.*, *Gardensensor, Inc. v. Stanley Black & Decker, Inc*., 2014 U.S. Dist. LEXIS 135302, at *9 (N.D. Cal. Sep. 24, 2014) ("[defendant] attempts to distinguish *eCommerce* by arguing that it only applies 'where the lost profits are recoverable by virtue of a violation of a non-compete clause.'[] However, there is no indication in the *eCommerce* opinion that its holding is so limited.").

contract that "negate[d] one of the essential elements of a relationship that could turn lost profits that would otherwise be consequential into direct damages." *Id.* at 433.

Here, Plaintiffs allege that lost profits are directly and immediately linked to Hospira's failure to manufacture ReoPro for commercial sale by Cilag and its Affiliates.  Under the DSA, Hospira had the exclusive right to manufacture finished ReoPro and was obligated to sell ReoPro only to Cilag and its Affiliates.  Compl. ¶¶ 20–21, 55; DSA §§ 2.1, 5.1, 5.3.  Plaintiffs could not sell ReoPro without Hospira performing, and Hospira could not earn the benefit of its bargain absent Plaintiffs' downstream sales.  Indeed, in Section 2.1 of the DSA, the parties anticipated that Cilag and its Affiliates would immediately sell ReoPro; as such, lost profits from such sales are the foreseeable consequence of Hospira's failure to supply ReoPro.  *Id.* ¶¶ 19–20.  And Hospira's earnings would grow as ReoPro sales increased.  *Id.* ¶¶ 23–24, 61. Under such an arrangement, lost profits are the only true measure of the damages to a buyer based on a manufacturer's failure to provide product.  *See, e.g.*, *Biotronik*, 22 N.Y.3d 799 at 808–09 ("The purpose of the agreement was to resell.")[6]  Absent damages for these lost sales in the form of lost profits, Plaintiffs would be left with no meaningful remedy under the DSA.  Compl. ¶¶ 28, 55.

Courts agree, moreover, that whether damages are direct or consequential is a factual determination that should be made after discovery.  *See CrewFacilities.com, LLC v. HotelEngine, Inc.*, 2021 U.S. Dist. LEXIS 119769, at *8 (D. Del. June 28, 2021).  As this Court has held,

---

[6] Hospira's contention that lost profits are consequential because "lost profits on collateral business arrangements . . . are reasonably considered consequential damages," *see* Opp. Br. at 8, is not only circular but inconsistent with the case law holding the lost profits can be direct under circumstances such as those here. *See Biotronik*, 22 N.Y.3d 799, 808, 988 (2007) (holding that "[t]his distinction does not mean that lost resale profits can never be general damages simply because they involve a third-party transaction. Such a bright line rule violates the case-specific approach [courts] have used to distinguish general damages from consequential damages."); *see also supra* at p. 12–13.

"categorization of damages is not an issue that this Court will decide during a motion to dismiss.

*Id.*  The Court should decline Hospira's invitation to do so here.

## II.    JANSSEN HAS STANDING TO ENFORCE THE DSA

Janssen has standing to bring its claims for breach of contract and breach of the implied

covenant of good faith and fair dealing because it is either a party to the DSA or, alternatively, an

intended third-party beneficiary of the DSA.  *Cf.* Opp. Br. at 13.

### A.    Janssen Is a Party to the DSA

Janssen is a party to the DSA.  As provided in multiple sections of the DSA, Cilag's

Affiliates have both rights and obligations under the Agreement.  *See, e.g.*, DSA § 2.1 (Hospira

to manufacture and deliver "Product to [Cilag] for commercial sale by [Cilag], its Affiliates and

the Licensees); § 4.1 (Affiliates required to provide regulatory filings in specific form and

Affiliates, along with Cilag, are "sole owners" of specific submissions); § 5.1 (Hospira to

manufacture Product for Cilag, Affiliates, and the Licensee and Cilag, Affiliates, and the

Licensee to course total worldwide requirements from Hospira); § 8.3 (Hospira to indemnify

Cilag's Affiliates); § 12.9 (Hospira required to include Affiliates of Cilag as insureds with respect

to required coverage); *see also* Compl. ¶ 17.

Section 8.1(f) of the DSA makes clear that Cilag had "***the right to bind its Affiliates to***

***the terms of this Agreement***" and that Janssen's corporate predecessor, Centocor, is one of the

specific Affiliates being bound.  *See* DSA § 8.1(f); Compl. ¶ 7 n.2.  Accordingly, not only was

Hospira required to manufacture ReoPro for "commercial sale by" Janssen as one of Cilag's

Affiliates, *see* DSA § 2.1, Janssen (as an Affiliate) was bound to the DSA's terms by Cilag.  *See*

DSA § 8.1(f).  Cilag was therefore acting as a principal and an agent of Janssen and other

Affiliates to bind them, as well as Cilag itself, to the terms of the DSA, and Janssen is

15

accordingly a party. *See* Restatement (Third) of Agency §6.01 (where an agent contracts for a principal, both agent and principal may be parties to the contract by consent).

**B.      Janssen Alternatively Qualifies as a Third-Party Beneficiary of the DSA**

Even if the provisions of the DSA were not sufficient to make Janssen a party to the DSA, the Complaint's allegations and the terms of the DSA make clear that, under Delaware law, Janssen qualifies as a third-party beneficiary of the DSA. *See* Compl. ¶¶ 17–18. In order to establish third-party beneficiary rights under Delaware law, a party must allege three things: (1) an intent between the contracting parties to benefit a third party through the contract, (2) the benefit being intended to serve as a gift or in satisfaction of a pre-existing obligation to the third party, and (3) a showing that benefiting the third party was a material aspect to the parties agreeing to contract. *See United Health All., Ltd. Liab. Co. v. United Med., Ltd. Liab. Co.*, 2014 Del. Ch. LEXIS 233, at *9 (Del. Ch. Nov. 20, 2014). All of these elements are sufficiently pled.

**1.      The parties intended for Janssen Biotech to benefit from the DSA**

As alleged in the Complaint, the parties to the DSA "intended to confer benefits on Janssen, as Cilag's Affiliate, such that satisfying Janssen's worldwide ReoPro requirements was known, understood, and intended by Cilag and Hospira to be a fundamental part of Hospira's manufacturing and supply obligations." Compl. ¶ 17. Tellingly, Defendants concede that "the parties acknowledged that unnamed affiliates of Cilag might ultimately receive and then sell ReoPro." Opp. Br. at 16. And the face of the DSA makes clear that the parties acknowledged much more.

As explained above, Section 8.1(f) of the DSA explicitly identifies Janssen's predecessor, Centocor, Inc., and affirms its rights and obligations under the DSA, as well as its status as an Affiliate of Cilag. *See* DSA § 8.1(f); *see also supra*, p. 4–5. The parties explicitly agreed that Hospira "shall Manufacture, sell and deliver Product to Company, and Company shall purchase

and take delivery of its **and its Affiliates** . . . total worldwide requirements" of ReoPro.  DSA § 5.1 (emphasis added); *see also* DSA at 1.  And Janssen, as an Affiliate of Cilag, was granted other benefits under the Agreement.  *See supra* at 2, 5.

None of the cases cited by Defendants suggest this is insufficient to show that the parties intended to benefit Janssen.  Opp. Br. at 14–16.  Defendants' two primary cases involved contracts that neither directly referenced a party in the agreement as an affiliate nor expressed an intent to benefit any non-signatory.  In *Micro Focus (US), Inc. v. Ins. Servs. Office, Inc.*, 2022 U.S. Dist. LEXIS 85846 (D. Del. May 12, 2022), this Court found that the non-signatory plaintiff lacked standing where the relevant contract merely "hint[ed]" at the existence of other entities associated with plaintiff and that ownership of software under a contract does not, on its own, support third-party beneficiary status.  2022 U.S. Dist. LEXIS 85846 at *4–5.  Likewise, the court in *Eastman Chem. Co. v. Alphapet Inc*. held that the relevant agreement there contained no direct reference at all to a putative third-party beneficiary.  2011 U.S. Dist. LEXIS 158477, at *18–19 (D. Del. Nov. 18, 2011) (noting that, while the contract "outlines several reasons motivating the parties to enter into the agreement, [it] does not reference any intent to benefit IRP nor any other non-party").  In contrast, as discussed above, Janssen (through its predecessor, Centocor) is explicitly named in the DSA, bound to the terms of the DSA, and identified as a recipient of the DSA's benefits.  *See also infra*, p. 17–19.

## 2.  The intended benefit was in satisfaction of Cilag's pre-existing obligation to Janssen Biotech

In a single sentence, Defendants state that "there is no suggestion that Hospira's performance under [the DSA] was somehow a gift . . . or satisfaction of a pre-existing obligation."  Opp. Br. at 16.  But the Complaint specifically alleges that Janssen had pre-existing rights and obligations with respect to ReoPro as of the DSA's execution in 2006, Compl. ¶ 17,

and that Cilag entered the DSA, in part, to satisfy its pre-existing duty to Janssen to manufacture and supply ReoPro, which was an obligation Cilag took on prior to its execution of the DSA. *Id*. ¶ 18; *see also Id*. ¶¶ 13–14 (describing Cilag's responsibility to secure manufacturing for ReoPro). Discovery will show that this was a long-standing role of Cilag within the J&J pharmaceutical sector. Cilag was the J&J company that entered third-party manufacturing agreements on behalf of other J&J pharmaceutical companies like Centocor and its successor Janssen. At the pleadings stage, Plaintiffs' factual allegations must be accepted as true.

In *United Health Alliance*, the defendant moved to dismiss claims by two affiliates under an agreement, arguing that they were not alleged to be third-party beneficiaries. The plaintiff alleged that it had contracted to provide services to the two affiliates, and subsequently contracted separately with the defendant to provide the benefit of such services to the affiliates in order to fulfill plaintiff's pre-existing obligation. 2014 Del. Ch. LEXIS 233, at *15–16. The court held that the affiliates met the second element of the third-party beneficiary test because "there likely was some benefit and burden placed on both the Affiliates and plaintiffs by the arrangement they had between them; and any contract between [the parties] would have provided the benefit of [] services to the Affiliates, thereby fulfilling plaintiff's pre-existing obligation." *Id*. at *15. The same is true here.

### 3. Benefiting Janssen was a material aspect of the DSA

Plaintiffs also allege that benefitting Janssen was a material part of the parties' purpose for entering into the DSA. *See* Compl. ¶¶ 18, 70–71. Defendants' conclusory statements to the contrary fall flat. Opp. Br. at 16–17. The Complaint alleges, among other things, that Janssen is the key Affiliate of Cilag with respect to the DSA, and because Cilag's contractual obligations were undertaken in order to satisfy and meet Janssen's worldwide requirements for ReoPro, the conferring of the beneficial effect on Janssen was a material part of the DSA's purpose. Compl.

¶¶ 18, 70–71.  It was material to and explicit in the DSA that Cilag was acting on behalf of and

was authorized to bind its Affiliates to the terms of the DSA.  *See* DSA § 8.1(f).  Benefitting

Janssen and other Affiliates of Cilag was material to the DSA because without that benefit, the

DSA would have been meaningless.  *See United Health Alliance*, 2014 Del. Ch. LEXIS 233, at

*25.

## III.   PLAINTIFFS' CLAIMS THAT HOSPIRA BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING MUST PROCEED

Plaintiffs' good faith and fair dealing claims go straight to the core purpose of the DSA,

which was to ensure a long-term, demand-based, and continuous supply of ReoPro to Cilag and

its Affiliates, including Janssen, to meet the demands of the worldwide market.  Compl. ¶¶ 5, 17–

18, 20.  Hospira's unreasonable, bad-faith conduct in refusing to perform despite its knowledge

that Cilag would not be able to cover, eviscerated Plaintiffs' ability to participate at all in the

global ReoPro market.  *Id.* ¶¶ 76–77.  The implied covenant of good faith and fair dealing is

necessary here to address the consequences of Hospira's breach of its fundamental obligations—

that is, the destruction of ReoPro as a viable product—which go beyond its failures to

manufacture under the Agreement.

Parties are liable for breaching the covenant when their conduct frustrates the overarching

purpose of the contract by taking advantage of their position to control implementation of the

agreement's terms."  *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005); *see

also S. Track & Pump, Inc. v. Terex Corp.*, 623 F. Supp. 2d 558, 562 (D. Del. 2009).  Implied

covenants are sometimes necessary to ensure the parties' reasonable expectations are fulfilled.

*See S. Track*, 623 F. Supp. 2d at 562 (citing *Dunlap*, 878 A.2d at 442).

Hospira's conduct directly and unreasonably deprived Plaintiffs of the benefits of their

bargain, and destroyed their place in the market for ReoPro.  *See* Compl. ¶¶ 77, 82.  By refusing

19

to deliver on its promises, Hospira "frustrate[d] the overarching purpose of the contract by taking advantage of [its] position to control implementation of the agreement's terms."  *See Dunlap*, 878 A.2d at 442.

Defendants rely on *In REI Holdings, LLC v. LienClear - 000*, but that case is inapposite. In *REI*, the plaintiff requested that the court imply a term in the contract, based on the duty of good faith and fair dealing, that would result in certain tax liens being worth more than their purchase price.  *See In REI Holdings, LLC v. LienClear – 000*, 2019 U.S. Dist. LEXIS 130285, at *29.  The court held that "such a significant" revision to the terms of the contract was clearly beyond the limited role of which the implied covenant is supposed to play.  *Id*.

## IV.   HOSPIRA'S MOTION SHOULD BE DENIED BECAUSE PLAINTIFFS' INTERPRETATION OF THE DSA IS REASONABLE

To prevail on their motion, Defendants must demonstrate that only their interpretation of the DSA is reasonable and no reasonable person could accept Plaintiffs' interpretation. Defendants have not met this heavy burden.  While Plaintiffs believe their reading is the only proper one, if the Court concludes the relevant provisions are amenable to more than one reasonable interpretation, Hospira's motion must be denied.  *See Ecolab Inc.*, 2022 U.S. Dist. LEXIS 78867, at *10 (denying a 12(b)(6) motion when the court was "faced with two reasonable interpretations"); *see also Emerald Capital Advisors*, 581 B.R. at 107; *CHS/Community Health*, 2020 Del. Ch. LEXIS 271, at *5–6; *IMS Health, Inc. v. Vality Tech., Inc*., 2000 U.S. Dist. LEXIS 8635, at *12 (E.D. Pa. June 22, 2000) (holding that the trier of fact determines the proper interpretation of a contract).

## CONCLUSION

For the reasons above, the Court should deny Defendants' partial motion to dismiss in its entirety.

Dated:  August 1, 2022    BALLARD SPAHR, LLP

          */s/ Beth Moskow-Schnoll*
          Beth Moskow-Schnoll (Del. No. 2900)
          Brittany Giusini (Del. No. 6034)
          919 North Market Street, 11th Floor
          Wilmington, Delaware 19801-3034
          Telephone: (302) 252-4465
          Facsimile: (302) 252-4466
          Email: moskowb@ballardspahr.com
            giusinib@ballardspahr.com

          OF COUNSEL:

          PATTERSON BELKNAP WEBB AND TYLER
          LLP
          William F. Cavanaugh, Jr.
          Jonathan H. Hatch
          Alejandro H. Cruz
          Nathaniel Lancaster
          1133 Avenue of the Americas
          New York, NY, 10036
          Telephone: (212) 336-7625
          Facsimile: (212) 336-1269
          Email:  wfcavanaugh@pbwt.com
            jhatch@pbwt.com
            acruz@pbwt.com
            nlancaster@pbwt.com

          CARLTON FIELDS, LLP
          Mark A. Neubauer
          Steven B. Weisburd
          2029 Century Park East, Suite 1200
          Los Angeles, CA 90067-2913
          Telephone:  (310) 843-6300
          Facsimile:  (310) 843-6301
          Email:  mneubauer@carltonfields.com
            sweisburd@carltonfields.com

          *Attorneys for Plaintiffs Cilag GmbH International*
          *and Janssen Biotech, Inc.*