# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CILAG GMBH INTERNATIONAL, a Swiss corporation; and JANSSEN BIOTECH, INC., a Pennsylvania corporation, ) ) ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | Civil Action No. 22-589-RGA-SRF |
| HOSPIRA WORLDWIDE, LLC, a Delaware corporation f/k/a Hospira Worldwide Inc.; and HOSPIRA, INC., a Delaware corporation, ) ) ) ) ) | |
| Defendants. ) | |

## REPORT AND RECOMMENDATION

Presently before the court in this diversity action alleging breach of a supply contract is a partial motion to dismiss for lack of standing under Federal Rule of Civil Procedure 12(b)(1) and failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), which was filed by defendants Hospira Worldwide, LLC ("Hospira") and Hospira, Inc. (collectively, "Defendants"). (D.I. 13)[1] For the following reasons, I recommend that the court GRANT-IN-PART Defendants' partial motion to dismiss.

**I.    BACKGROUND**

Plaintiffs Cilag GmbH International ("Cilag") and Janssen Biotech, Inc. ("Janssen Biotech;" collectively, "Plaintiffs") filed this action in the Superior Court for the State of Delaware on April 28, 2022, and Defendants removed the action to this court on May 2, 2022, based on diversity jurisdiction under 28 U.S.C. § 1332(a). (D.I. 1 & Ex. B) The complaint

---

[1] The briefing associated with the pending motions is found at D.I. 14, D.I. 16, and D.I. 18.

asserts four causes of action based on alleged breaches of a 2006 Development and Supply Agreement ("DSA") executed between Cilag and Hospira, and a 2017 Quality Technical Agreement ("QTA") executed between Hospira, Inc. and non-party Janssen Pharmaceuticals. (D.I. 1, Ex. B at ¶¶ 1, 7)

ReoPro® is a blood thinner medication used to prevent narrowing of the arteries in patients undergoing coronary procedures. (D.I. 1, Ex. B at ¶ 13)  Before the DSA was signed, Cilag was responsible for contracting with a manufacturer capable of producing sufficient quantities to meet the worldwide demand for ReoPro®. (*Id.* at ¶ 14)  On May 1, 2006, Cilag and Hospira executed the DSA to govern the supply and manufacture of ReoPro®. (*Id.* at ¶ 15)  The DSA provided that Cilag would supply Hospira with the active biologic ingredient for ReoPro®, and Hospira would exclusively manufacture and supply ReoPro® to Cilag in exchange for a contractually agreed-upon per-vial price. (D.I. 1, Ex. B at ¶¶ 16, 21; *id.*, Ex. B at Ex. A, § 5.8 & Ex. 5.8)  To achieve these ends, Cilag agreed to provide technical support to enable Hospira to set up its manufacturing facility in McPherson, Kansas (the "Hospira Facility") for the production and manufacture of ReoPro®. (*Id.*, Ex. B at ¶ 19)  In addition to Hospira's production requirements, the DSA imposed various quality-related requirements on Hospira. (*Id.*, Ex. B at ¶ 22)

Hospira's technical obligations under the DSA were further specified in the Quality Technical Agreement ("QTA") executed between Hospira, Inc. and non-party Janssen Pharmaceuticals on May 23, 2017. (D.I. 1, Ex. B at ¶¶ 33-39; Ex. B at Ex. B)  The QTA, which was incorporated by reference into the DSA, mandated that Hospira, Inc. must "provide adequate resources, including the assignment of trained personnel, in order to . . . manufacture the requested quantities of [ReoPro]" conf[o]rming with the specified requirements." (D.I. 1, Ex. B

at ¶ 37; Ex. B at Ex. A, § 6.3; Ex. B, § 9.2) The QTA governs Hospira, Inc.'s "quality-related responsibilities," while the DSA "shall control for all other provisions" in the event of a conflict between the QTA and DSA. (*Id.*, Ex. B at ¶ 34)

Beginning in 2016, the FDA began auditing the Hospira Facility. (D.I. 1, Ex. B at ¶ 40) In February 2017, those audits culminated in the issuance of a Warning Letter to Hospira, which described "significant violations of current good manufacturing practice regulations for finished pharmaceuticals," resulting in the production of adulterated drug products. (*Id.*) These supplier quality concerns resulted in shortages of ReoPro®, as four of the final five fills of ReoPro® between October 2017 and April 2018 were rejected for quality failures. (*Id.* at ¶¶ 42-43) In addition, Janssen Biotech had previously rejected lots of ReoPro® for quality deficiencies due to contamination by particulate matter. (*Id.* at ¶ 43)

Hospira shut down production at the Hospira Facility in 2017 to remediate the problems identified by the FDA. (D.I. 1, Ex. B at ¶ 45) As a result, ReoPro® was globally placed on back order, and customers began using alternative products. (*Id.*) The complaint does not specify how long the Hospira Facility was closed.

In June 2018, Hospira notified Cilag of its intention to terminate the DSA as of December 31, 2020. (*Id.* at ¶ 46) Defendants' failure to meet their obligations under the DSA and QTA continued through the termination of the DSA. (*Id.* at ¶ 44) Because it would take twenty-four months for Cilag to obtain another qualified and approved replacement manufacturer, Plaintiffs discontinued worldwide sales of ReoPro® during this time. (*Id.* at ¶¶ 46, 54) As a result of Defendants' failure to comply with their obligations under the DSA and QTA, Plaintiffs suffered substantial financial losses. (*Id.* at ¶¶ 50-52)

Defendants filed the pending motion on July 1, 2022, seeking dismissal of Counts II, III, and IV of the complaint, as well as Plaintiffs' claims for lost profits. (D.I. 13; D.I. 14) The pending motion is not directed to Count I of the complaint for Cilag's allegations of breach of contract against Hospira. Count II asserts a cause of action by Janssen Biotech for breach of contract against Defendants. (D.I. 1, Ex. B at ¶¶ 69-73) Counts III and IV assert causes of action against Defendants for breach of the implied covenant of good faith and fair dealing, brought by Cilag and Janssen Biotech, respectively. (*Id.* at ¶¶ 74-84)

## II.  LEGAL STANDARD

Rule 12(b)(6) permits a party to move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and view them in the light most favorable to the plaintiff. *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790-91 (3d Cir. 2016).

To state a claim upon which relief can be granted pursuant to Rule 12(b)(6), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although detailed factual allegations are not required, the complaint must set forth sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). A claim is facially plausible when the factual allegations allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 663; *Twombly*, 550 U.S. at 555-56.

The court's determination is not whether the non-moving party "will ultimately prevail," but whether that party is "entitled to offer evidence to support the claims." *In re Burlington Coat*

*Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal citations and quotation marks omitted). This "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [the necessary element]." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). The court's analysis is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663-64.

## III. DISCUSSION

### A. Consequential Damages

Section 8.6 of the DSA bars the parties' recovery of consequential damages in the event of a breach:

> NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES RESULTING FROM ANY BREACH OF THIS AGREEMENT EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(D.I. 1, Ex. B at Ex. A, § 8.6) The parties disagree as to whether the term "consequential damages" in § 8.6 includes profits lost by Cilag and its Affiliates as a result of Hospira's manufacturing deficiencies.

Defendants argue that the court should dismiss Plaintiffs' pleaded claims for lost profits because these damages are expressly barred by the DSA's prohibition against the recovery of consequential damages. (D.I. 14 at 7-12) According to Defendants, it is apparent from the face of the complaint that the damages are consequential because Plaintiffs seek recovery for collateral, future sales of ReoPro® to third parties by Janssen Biotech, a non-party to the DSA. (*Id.* at 10-11) Defendants dispute the reasonableness of Plaintiffs' contention that Hospira's own

profits were tied to profits earned on the sale of ReoPro® because Hospira was paid a fixed price per vial unconnected to subsequent sales of the product by Cilag. (*Id.* at 11)

Plaintiffs respond that the lost profits sought in the complaint are direct, not consequential damages, because they are immediately and foreseeably linked to Hospira's failure to manufacture ReoPro® for commercial sale by Cilag and its Affiliates. (D.I. 16 at 12-14) Had the parties intended to exclude the recovery of lost profits, Plaintiffs argue that the DSA would have expressly identified lost profits as an excluded remedy. (*Id.* at 10-11) As it stands, Plaintiffs explain that the only express exclusion of lost profits under the DSA arises in the context of a product recall, which is inapplicable to the facts of this case. (*Id.*) Plaintiffs further contend that the issue of whether damages are direct or consequential is a question of fact not appropriately resolved on a motion to dismiss. (*Id.* at 14-15)

Case authorities cited by both parties confirm that lost profits "may be classified as either direct damages or consequential damages, depending on the factual situation[.]" *No Spill, Inc. v. Scepter Canada, Inc.*, 429 F. Supp. 3d 768, 782 (D. Kan. 2019) (citing *Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151 (10th Cir. 2007); *see also eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, 2013 WL 5621678, at *47 (Del. Ch. Sept. 30, 2013). Plaintiffs have alleged that their lost profits are direct damages: "Hospira's failure to meet its required production under the [DSA] directly resulted in Cilag/Janssen's inability to sell the product Hospira was supposed to manufacture," causing Plaintiffs to "los[e] any ability to sell ReoPro® and profit from the [DSA]" and thereby denying them the benefit of their bargain. (D.I. 1, Ex. B at ¶ 3) The complaint further alleges that, "absent an award of lost profits, Cilag/Janssen would be left without any remedy as to lost sales of ReoPro®, which are a direct result of Hospira's breaches." (*Id.* at ¶ 28) At this stage of the case, the court must accept these allegations as true. *See*

*CrewFacilities.com, LLC v. HotelEngine, Inc.*, C.A. No. 20-1637-RGA, 2021 WL 2649758, at *3 (D. Del. June 28, 2021) ("Determination of the categorization of damages is not an issue that this Court will decide during a motion to dismiss.").

Moreover, Plaintiffs rely on a plausible interpretation of the DSA in support of their position that lost profits are direct damages. As previously stated, lost profits can be either direct or consequential damages, and the express exclusion of consequential damages in § 8.6 does not preclude the recovery of direct damages. *See eCommerce*, 2013 WL 5621678, at *47. Section 2.1 of the DSA expressly associates Hospira's manufacture of ReoPro® with Cilag's commercial sale of ReoPro®. (D.I. 1, Ex. B at Ex. A, § 2.1) Citing *Biotronik A.G. v. Conor Medsys. Ireland, Ltd.*, Plaintiffs plausibly allege that, under § 2.1 of the DSA, direct lost profits are the foreseeable consequence of Hospira's breach of its manufacturing obligations. 22 N.Y.3d 799, 808-09 (N.Y. 2007).

Defendants argue that *Biotronik* and other cases cited by Plaintiffs are distinguishable because they involved distribution agreements, as opposed to a supply agreement like the one at issue in this case. (11/30/2022 Tr.) But the crucial factor in *Biotronik* was the nature and broader purpose of the agreement in its entirety. *Biotronik*, 22 N.Y.3d at 809. At this early stage of the proceedings, the court cannot conclude as a matter of law that Cilag's lost profits were not a "natural and probable consequence" of the breach of the DSA, which requires Hospira to manufacture ReoPro® in specified quantities for Cilag to sell. *Cf. id.* at 804-05 (reversing trial court's summary judgment ruling that lost profits sought by plaintiff were consequential damages subject to the contract's damages limitation provision). The exclusive nature of the DSA further supports the plausibility of Plaintiffs' position because Hospira's exclusive right to manufacture ReoPro® placed Cilag in a position of having no product to sell following

Hospira's manufacturing failures. (D.I. 1, Ex. B at Ex. A, § 5.1); *see Gardensensor, Inc. v. Stanley Black & Decker, Inc.*, 2014 WL 4764628, at *4 (N.D. Cal. Sept. 24, 2014) (concluding on summary judgment that lost profits were not barred by contractual limitation on liability where the agreement contained exclusivity rights on manufacturing).

Plaintiffs also point to § 6.8 of the DSA, which expressly precludes the recovery of lost profits in the event of a product recall: "For purposes of this Agreement, the expenses of the recall shall include, but not be limited to, the expenses of notification and destruction or return of the recalled Product, cost of the recalled Product, and any costs associated with the distribution of the replacement Product, but shall not include lost profits of either party." (D.I. 1, Ex. B at Ex. A, § 6.8) According to Plaintiffs, this provision confirms that the parties knew how to expressly exclude the recovery of lost profits when that was their intent, and the omission of lost profits from § 8.6 signifies that the parties did not intend to preclude recovery on that basis. (D.I. 16 at 11) At this early stage of the proceedings, the court cannot conclude that Plaintiffs' interpretation is unreasonable as a matter of law. *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003) ("In deciding a motion to dismiss, the trial court cannot choose between two differing reasonable interpretations of ambiguous provisions. Dismissal, pursuant to Rule 12(b)(6), is proper only if the defendants' interpretation is the *only* reasonable construction as a matter of law.").

Defendants cite a number of cases in support of their position that Plaintiffs' lost profits cannot plausibly be characterized as direct damages under the terms of the DSA. Most of these cases arose in the context of a motion for summary judgment, *see In re ADI Liquidation, Inc.*, 555 B.R. 423 (Bankr. D. Del. 2016); *First Niagara Bank N.A. v. Mortg. Builder Software, Inc.*, 2016 WL 2962817 (W.D.N.Y. May 22, 2016), or post-trial findings of fact and conclusions of

law, *see eCommerce*, 2013 WL 5621678, at *1; *VICI Racing, LLC v. T-Mobile USA, Inc.*, 87 F. Supp. 3d 697 (D. Del. 2015). The procedural posture of these cases supports Plaintiffs' position that a dispositive determination on this issue should not be reached until after discovery has concluded. *See CrewFacilities.com*, 2021 WL 2649758, at *3 (declining to dismiss the complaint's direct damages claim based on a limited liability clause in the underlying contract).

Two non-precedential cases cited by Defendants are distinguishable on their facts and are therefore not persuasive for the cited proposition. In *Strassle v. Bimbo Foods Bakeries Distribution, Inc.*, the court agreed with the defendant that the distinction between direct and consequential lost profits was "not applicable in the present context" because the contract was governed by the New Jersey Uniform Commercial Code. 2013 WL 1007289, at *5-6 (D.N.J. Mar. 12, 2013). Moreover, the court found that in the U.C.C. context, lost profits fall within the exclusive province of consequential rather than direct damages. *Id.* Likewise, in *No Spill, Inc. v. Scepter Canada, Inc.*, the court applied Kansas case law and the Uniform Commercial Code to find that the plaintiff's alleged lost resale profits from third parties were consequential damages that were barred under the supply agreement's limitation of liability provision. 429 F. Supp. 3d at 783.

For these reasons, I recommend that the court deny Defendants' motion to dismiss Plaintiffs' damages claim for lost profits.

**B. Standing to Enforce the DSA**

Defendants argue that the court should dismiss Counts II and IV of the complaint, which assert causes of action against Janssen Biotech for breach of contract and breach of the implied covenant of good faith and fair dealing, respectively, because Janssen Biotech lacks standing.

(D.I. 14 at 13) Specifically, Defendants maintain that Janssen Biotech is neither a party to the DSA and QTA, nor a third-party beneficiary of those agreements. (*Id.* at 13-17)

Plaintiffs initially alleged that Janssen Biotech is a party to the DSA due to its status as an Affiliate of Cilag, but they appeared to abandon this position during oral argument. (D.I. 16 at 15; 11/30/2022 Tr.) The court concludes that Janssen Biotech is not a party to the DSA or the QTA. "As a general matter, only a party to a contract has standing to enforce a contract and sue for breach of that contract." *Rottlund Homes of N.J., Inc. v. Saul, Ewing, Remick & Saul, L.L.P.*, 243 F. Supp. 2d 145, 153 (D. Del. 2003); *Micro Focus (US), Inc. v. Ins. Servs. Off., Inc.*, C.A. No. 15-252-RGA, 2022 WL 1503918 (D. Del. May 12, 2022). The record before the court confirms that the parties to the DSA are Cilag GmbH International and Hospira Worldwide, Inc., (D.I. 1, Ex. B at Ex. A), and the parties to the QTA are Hospira, Inc. and Janssen Pharmaceuticals, (*id.*, Ex. B at Ex. B). Janssen Biotech is not included among these parties.

Plaintiffs maintain that Janssen Biotech nonetheless has third-party beneficiary status under the DSA. (D.I. 16 at 16-19) To determine whether an entity is a third-party beneficiary, the court must consider the intent of the parties who entered into the contract, i.e., "(a) the contracting parties must have intended that the third party beneficiary benefit from the contract, (b) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and (c) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract." *In re Stone & Webster, Inc.*, 558 F.3d 234, 241 (3d Cir. 2009). Plaintiffs have not pled facts showing that both parties to the contract intended Janssen Biotech to be a third-party beneficiary under the first prong of this conjunctive inquiry. *See Micro Focus*, 2022 WL 1503918, at *2 (stating that the plaintiff "must show that both parties to the contract intended for [the alleged third-party beneficiary] to be a third-party beneficiary.").

10

The complaint alleges that the parties to the DSA intended Janssen Biotech to be a third-party beneficiary because Janssen Biotech qualifies as an "Affiliate" of Cilag under the DSA. (D.I. 1, Ex. B at ¶ 17) The parties do not meaningfully dispute that Janssen Biotech is an "Affiliate" under the DSA, and Plaintiffs' answering brief reiterates that this Affiliate status is sufficient to confirm the parties' intention to benefit Janssen Biotech. (D.I. 16 at 16) But Janssen Biotech's status as an Affiliate under the DSA is not enough, by itself, to establish the parties' intent to benefit it. *See Eastman Chem. Co. v. AlphaPet Inc.*, C.A. No. 09-971-LPS-CJB, 2011 WL 6004079, at *6 (D. Del. Nov. 4, 2011) ("[I]f mere Affiliate status . . . was sufficient to transform a non-party into a third-party beneficiary of the agreement, then numerous other companies . . . would all likewise be deemed third-party beneficiaries" of the contract). Plaintiffs have not pled facts sufficient to show that both Hospira and Cilag intended to confer third-party beneficiary status on Janssen Biotech. *See Micro Focus*, 2022 WL 1503918, at *2. Consequently, I recommend that the court dismiss Counts II and IV of the complaint due to Janssen Biotech's lack of standing.

### C. Breach of Implied Covenant of Good Faith and Fair Dealing

Defendants argue that Plaintiffs' causes of action for breach of the implied covenant at Counts III and IV of the complaint should be dismissed because they are duplicative of Plaintiffs' breach of contract claims and assert only conclusory allegations of bad faith. (D.I. 14 at 18-19) Defendants suggest Plaintiffs are attempting to evade the DSA's waiver of consequential lost profits damages by asserting these causes of action for breach of the implied covenant. (*Id.* at 20)

Plaintiffs respond that Counts III and IV are not duplicative because the claims seek relief for Defendants' breach of their implied obligation to provide a continuous and reliable supply of

11

ReoPro® to meet worldwide market demand. (D.I. 16 at 19) According to Plaintiffs, the destruction of ReoPro® as a viable product goes beyond Hospira's failure to manufacture under the DSA. (*Id.*)

The implied covenant of good faith and fair dealing "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010) (internal quotations omitted). To plead a claim for breach of the implied covenant, "a litigant must allege a specific obligation implied in the contract, a breach of that obligation, and resulting damages." *Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at *3 (Del. Ch. Jan. 30, 2015). When the contract addresses the conduct at issue, breach of the implied covenant cannot be invoked. *Phunware, Inc. v. Excelmind Grp. Ltd.*, 117 F. Supp. 3d 613, 628 (D. Del. 2015). "The doctrine thus operates only in that narrow band of cases where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer. In the Venn diagram of contract cases, the area of overlap is quite small." *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009). A contract term may only be implied "when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected." *Nemec*, 991 A.2d at 1126.

I recommend that the court dismiss Plaintiffs' causes of action for breach of the implied covenant because the claims "do[ ] nothing more than duplicate the conduct alleged in the breach of contract claim[s]." *Zinetti v. Deutsche Bank Nat'l Tr. Co.*, C.A. No. 19-1279-LPS-JLH, 2020 WL 409725, at *10 (D. Del. Jan. 24, 2020). The allegations are rooted in contractual obligations

explicitly covered in the DSA and/or QTA, such as Defendants' obligation that the Hospira Facility was to serve as the exclusive manufacturer and supplier of ReoPro® meeting specified quality requirements and production amounts. (D.I. 1, Ex. B at ¶¶ 77, 82) The pleading alleges that Defendants' express obligations under the DSA and QTA presuppose Defendants' actual performance of those obligations, and Defendants should therefore be liable for damages caused by their nonperformance, which led to the destruction of the worldwide ReoPro® market. (*Id.*) But the remedies for Defendants' failure to perform their express contractual obligations are covered by the DSA and QTA. Plaintiffs now argue these remedies are not sufficient to compensate for the magnitude of Defendants' breaches, but the court may not "rewrite the contract to appease a party" who later believes the contract was a bad deal. *Nemec*, 991 A.2d at 1126.

The implied covenant claims are also deficient because they allege in a conclusory manner that "Hospira acted unreasonably so as to frustrate the fruits of the bargain that Cilag reasonably expected, by acting in bad faith so as to deprive Cilag of the benefit of its bargain." (D.I. 1, Ex. B at ¶ 76) But "[g]eneral allegations of bad faith conduct are not sufficient." *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009). The complaint confirms that Hospira shut down production for an unspecified length of time to conduct remediation efforts required by the FDA, impairing Hospira's ability to produce sufficient amounts of ReoPro®. (D.I. 1, Ex. B at ¶ 45) The complaint does not allege that quality issues in Hospira's manufacturing process were the result of intentional actions. These allegations do not support an inference that Defendants refused to produce conforming quantities of ReoPro® arbitrarily or in bad faith. Instead, it shows that Defendants' alleged quality control failures prevented them from satisfying the terms of the contracts, and they undertook remediation measures required by the

FDA. *See Airborne Health*, 984 A.2d at 147 (finding that failure to expend marketing resources to achieve financial targets was not done in bad faith where company had suffered corporate crisis precluding those expenditures). For these reasons, I recommend that the court dismiss Plaintiffs' causes of action for breach of the implied covenant at Counts III and IV of the complaint.

## IV.   CONCLUSION

For the foregoing reasons, I recommend that the court GRANT-IN-PART Defendants' partial motion to dismiss; dismiss Counts II, III, and IV of the complaint without prejudice; and allow Plaintiffs an opportunity to amend the complaint within 10 days of the expiration of the deadline for objections under Rule 72(b), or in accordance with a ruling from the court on objections, if any. (D.I. 13)

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objections and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated March 7, 2022, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: December 6, 2022

Sherry R. Fallon
UNITED STATES MAGISTRATE JUDGE