# EXHIBIT A

## DEVELOPMENT AND SUPPLY AGREEMENT

THIS DEVELOPMENT AND SUPPLY AGREEMENT (this "Agreement") is made as of this 1st day of May, 2006 (the "Effective Date") by and between Cilag GmbH International, a corporation organized under the laws of Switzerland, having a principal place of business at Chollerstrasse 38, CH-6300, Zug, Switzerland ("Company") and Hospira Worldwide, Inc., having a principal place of business at 275 North Field Drive, Lake Forest, Illinois, 60045, (U.S.A.) ("Hospira").

## WITNESSETH:

WHEREAS, Company and/or its Affiliates (as defined below) have rights to the compound ReoPro® (abciximab), a drug which is an adjunct to PCI for the prevention of cardiac ischemic complications, and markets ReoPro® in a 5mL standard flip top vial or as otherwise agreed to by the parties ("ReoPro®");

WHEREAS, Company and Hospira desire that Hospira assist Company in connection with certain development of the Product (as defined below) and thereafter provide contracting manufacturing services with respect to ReoPro® in accordance with the terms and conditions hereof; and

WHEREAS, after Company has received an approved sNDA from the U.S. Food and Drug Administration (the "FDA") and/or corresponding new drug approvals in selected international markets from appropriate Regulatory Authorities (as hereinafter defined), the parties desire that Hospira Manufacture and sell to Company its and its Affiliates and the Licensees' full worldwide requirements of ReoPro® (as provided herein at Section 5.1) during the Term (as defined herein) of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual promises and agreements contained herein, Company and Hospira agree as follows:

## Article 1.   DEFINITIONS

The following words and phrases when used herein with capital letters shall have the meanings set forth or referenced below:

1.1    "Affiliate" shall mean any corporation or non-corporate business entity which controls, is controlled by, or is under common control with a party to this Agreement.  A corporation or non-corporate business entity shall be regarded as in control of another corporation or non-corporate business entity if it owns, or directly or indirectly controls, in excess of fifty percent (50%) of the voting stock of the other corporation, or (a) in the absence of the ownership of in excess of fifty percent (50%) of the voting stock of a corporation or (b) in the case of a non-corporate business entity, if it possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such corporation or non-corporate business entity, as applicable.

1.2    "cGMP" shall mean as applicable (i) the current good manufacturing practices as set forth in 21 C.F.R. Part 210, 211 and 610, as applicable and The Rules Governing Medicinal Product in the European Community, Volume IV Good Manufacturing Practice for Medicinal Product as each may be amended, revised and updated from time to time and (ii) any laws or regulations as may be promulgated by any Regulatory Authority having jurisdiction over the Manufacture of the Product, and,  (iii) any guidance documents (including but not limited to advisory opinions, compliance policy guides and guidelines) as may be promulgated by any Regulatory Authority having jurisdiction over the Manufacture of the Product, which guidance documents are being implemented within the pharmaceutical and biopharmaceutical manufacturing industry for such Product.

1.3    "Confidential Information" shall mean (i) all confidential business information and (ii) technical communications, documents or other information in each case, whether in written, oral, electronic or other form, which either Party or an Affiliate of either Party furnishes or discloses (the "Disclosing Party") to the other ("Receiving Party") or which the Receiving Party otherwise learns in connection with the negotiation or performance of this Agreement (whether relating to a Party, an Affiliate of a Party or any Third Party for which for which a Party has an obligation of confidentiality).  The Parties agree that "Confidential Information" shall also include to all information disclosed by a Party or an Affiliate of a Party or learned by a Party prior to the Effective Date in connection with this Agreement.    Notwithstanding the foregoing, Confidential Information shall not include any portion thereof which:

    (a)  is known to the Receiving Party at the time of the disclosure, as evidenced by its written records or other competent evidence;

    (b)  is disclosed to the Receiving Party by a third person lawfully in possession of such information and not under an obligation of nondisclosure;

    (c)  is or becomes patented, published or otherwise part of the public domain through no fault of the Receiving Party; or

    (d)  is developed by or for the Receiving Party independently of Confidential Information disclosed hereunder as evidenced by the Receiving Party's written records or other competent evidence.

1.4    "Contract Year" shall mean a period of twelve (12) consecutive months which, for the first Contract Year of this Agreement, shall commence on the first day of the month after the month of Hospira's first sale of commercial Product to Company after Company has received the earlier of an approved sNDA from the FDA to Manufacture and release Product at the Facility or a corresponding government marketing approval in an international market from an appropriate Regulatory Authority (as hereinafter defined), and each Contract Year thereafter shall consist of twelve (12) consecutive months following the end of the preceding Contract Year.

1.5    "Dedicated Product-Contact Equipment" shall mean that equipment provided by Company or purchased by Hospira for use by Hospira solely in the Manufacture of Product pursuant to this Agreement.

2

1.6     "Drug" shall mean the human pharmaceutical ReoPro® (abciximab).

1.7     "Drug Substance" shall mean the active biologic ingredient of the Drug (as hereinafter defined) in bulk form that Company shall deliver to Hospira for incorporation into Product (as hereinafter defined) and meeting the applicable Drug Substance Specifications (as hereinafter defined).

1.8     "Drug Substance Specifications" shall mean the detailed description and parameters of the Drug Substance set forth on Exhibit 1.8.

1.9     "Facility" shall mean the Hospira manufacturing facility located at 1776 N. Centennial Drive, McPherson, Kansas.

1.10    "Final Release" shall mean a determination in writing by Company that a certain identified quantity of a Product meets the Product Specifications.

1.11    "Licensee" shall mean any Third Party which currently has or obtains at any time during the Term of this Agreement any right, license, or privilege to distribute the Drug anywhere in the world.

1.12    "Manufacture" shall mean all steps in the processing and preparation of the Product and shall include but not be limited to filling, in-process testing, labeling, packaging and storage of Product at the Facility, according to cGMPs and Product Specifications.

1.13    "Material" shall mean excipient ingredients, associated filling and/or packaging components (exclusive of Drug Product) as all of the following are utilized in the Manufacture of Product.

1.14    "Person in the Plant" shall have the meaning defined in Section 5.4.

1.15    "Product" shall mean the Drug in final dosage form, packaged in 5mL standard fliptop vial or as otherwise may be mutually agreed upon by the Parties from time to time in writing, meeting the Product Specifications.

1.16    "Product Specifications" shall mean those product, labeling and performance specifications for Product filed with the FDA or other appropriate Regulatory Authorities, including Product formula, labeling, and Materials required for the Manufacture of the Product that is to be purchased and supplied under this Agreement, as such are set forth on Exhibit 1.16, which specifications may be amended from time to time by the mutual written agreement of the parties.  Included also are the shipping, receiving and packaging specifications which shall be mutually agreed upon and shall be included in Hospira's standard operating procedures applicable to the Product, which include without limitation storing and shipping Product in refrigerated conditions that maintain a temperature of between 2 and 8 degrees Celsius.

1.17    "Product Supply Commitment" shall have the meaning provided in Section 7.1.

3

1.18    "Quality Agreement" shall mean the agreement between Hospira and Company, including any amendments, attachments, appendices and exhibits thereto, entered into to specify the quality and/or technical requirements and responsibilities of the Parties with respect to compliance, quality systems, and testing and the release of the Drug Substance and Product necessary for the Manufacture, supply and acceptance of the Product as attached hereto and incorporated herein by reference as Exhibit 6.3.

1.19    "Registration Batches" shall mean those lots of Drug Product as set forth on Exhibit 2.1.

1.20    "Regulatory Authority" shall mean any federal, state or local or international regulatory agency, department, bureau or other governmental entity including the FDA which is responsible for issuing approvals, licenses, registrations or authorizations necessary for the Manufacture, use, storage, import, transport or sale of Product in a regulatory jurisdiction.

1.21    "Specially Regulated Waste" shall mean any hazardous waste, toxic waste, medical waste, nuclear waste, mixed waste, or other waste materials or by-products, including waste water, which may be subject to or require special handling, treatment, storage, or disposal under any federal, state or local laws or regulations intended to address such types of waste materials that arise from the Manufacture of Product.

1.22    "Term" shall mean the period of time on and after the Effective Date until the later of: (a) the end of the Initial Term; or (b) the end of any Renewal Term.

1.23    "Third Party" shall mean a party other than Hospira or the Company and their respective Affiliates.

1.24    "Waste" shall mean all rejects, improper goods, garbage, refuse, remainder, residue, waste water or other discarded material, including solid, liquid, semisolid, or contained gaseous material that arises from the Manufacture of Product, including but not limited to, rejected, excess or unsuitable materials, Drug Substance and Products. The term Waste shall not include any Specially Regulated Waste.

## Article 2.   PRODUCT DEVELOPMENT PROJECT

2.1    General.  Promptly following the Effective Date, the parties shall undertake a product development project (the "Project") consisting of the development activities set forth in Exhibit 2.1, including the estimated timeline therefore.  The objective of the Project shall be for Hospira to assist in the qualification of the Facility as an approved manufacturing site for the Product and to assist Company in obtaining an approved sNDA (and/or foreign equivalents) covering the Product.  Hospira then shall Manufacture and deliver Product to Company for commercial sale by Company, its Affiliates and the Licensees as a human pharmaceutical product, as herein provided.

4

2.2   Commercially Reasonable Efforts.   Each party shall use its commercially reasonable efforts to successfully complete the Project.   However, the parties agree and understand that neither party hereto guarantees that the Project will be successful, or completed within the estimated timeline set forth in Exhibit 2.1, nor warrants or guarantees that a marketable product will result from the Project.

Article 3.   PAYMENT FOR HOSPIRA'S DEVELOPMENT EFFORTS

3.1   Development Fee.   To reimburse Hospira for its participation in the Project, Company shall pay to Hospira a nonrefundable development fee of Six Hundred Thirty Six Thousand Five Hundred Eighty Eight U.S. Dollars ($636,588 USD) (the "Development Fee"), which is exclusive of the price of Registration Batches as specified in Section 3.3.   The Development Fee shall be paid to Hospira in accordance with the payment schedule set forth in Exhibit 3.1.

3.2   Changes in Project Scope.   If changes occur in the Project or Product Specifications, or if technical difficulties require that Hospira perform either additional work or repeat work, and such additional work or repeat work is not required due to Hospira's fault or negligence, Hospira shall provide Company with cost estimates for such work. If Company approves such costs ("Approved Costs"), Hospira shall perform such work and Company shall pay the Approved Costs for such work within forty-five (45) days of receipt of invoice upon completion of such work.

3.3   Registration Batches.   Hospira shall provide Company Registration Batches at the prices set forth on Exhibit 5.8.

Article 4.   COMPANY'S REGULATORY SUBMISSIONS

4.1   Hospira's Right to Review.   Hospira shall have the right to review and consult on those portions of Company's and its Affiliates' proposed regulatory submissions relating to Hospira's Manufacturing procedures before the submissions are filed with appropriate Regulatory Authorities.   Company and its Affiliates shall provide all submissions in English. Hospira shall complete its review of the submissions within fifteen (15) days after receipt of a proposed regulatory submission.   Hospira shall consult with and advise Company and its Affiliates in responding to questions from the Regulatory Authorities regarding Company's and its Affiliates' submission(s) for Product.   Company and its Affiliates shall be the sole owner of any regulatory submission filed pursuant to this Agreement. Company and its Affiliates shall provide to Hospira for its files a final copy of the CMC section of any such regulatory submission(s).

4.2   Supplemental International Regulatory Filings.   Hospira shall quote a price for supplemental international regulatory, packaging and development work to support international filings (excluding the U.S. and any European Union countries) ("Supplemental International Filings") separately and on a country-by-country basis, which in no event shall exceed Ten Thousand U.S. Dollars ($10,000 USD) per Supplemental International Filing. Company shall provide required materials to Hospira in English. In addition, if inspections are requested or

required for any Supplemental International Filing, Hospira shall be entitled to an additional fee of Two Thousand Five Hundred U.S. Dollars ($2,500 USD) per day per inspection.

4.3   Access to Drug Master Files.   Hospira shall grant Company or its designated Affiliates reference rights to all Drug Master Files ("DMFs") necessary to support Company's or its designated Affiliate's applications for marketing authorizations of Product. To effect this, Hospira shall execute certain documentation ("Letters of Authorization") which shall be delivered in a timely manner to the appropriate Regulatory Authorities permitting such Regulatory Authorities to consult Hospira's DMFs in their review of Company's or its Affiliate's Product marketing applications. Hospira shall send copies of such Letters of Authorization to Company or its designated Affiliate. Hospira shall update its DMFs annually and shall inform Company prior to any modifications thereto in order to permit Company to amend or supplement any affected regulatory applications and filings for Product.

4.4   User Fees.   Company shall pay any FDA (or foreign equivalent) user fees which may become payable for Product.

## Article 5.   MANUFACTURE AND SUPPLY OF PRODUCT

5.1   Purchase and Sale of Product.   Pursuant to the terms and conditions of this Agreement and for the Term of this Agreement and except as otherwise provided in this Section 5.1, Hospira shall Manufacture, sell and deliver Product to Company, and Company shall purchase and take delivery of its and its Affiliates and the Licensee's total worldwide requirements of Drug exclusively from Hospira. The parties agree that should annual Product volume exceed 1,500,000 vials, Cilag shall have the option, in its sole discretion, of Manufacturing or contracting with a third party to Manufacture Product in excess of 1,500,000 vials. Hospira shall Manufacture Product in accordance with the terms and conditions of this Agreement. For purposes of clarity, Hospira agrees and acknowledges that Company may fulfill certain of its obligations under this Agreement, including without limitation, payment, forecasting and certain quality matters, through its Affiliate Global Biologics Supply Chain, LLC.

5.2   Government Approvals.   Notwithstanding any other provision of this Agreement, Hospira shall have no obligation to Manufacture, sell or deliver Product to Company and Company shall have no obligation to purchase and take delivery of Product for commercial sale in a specific territory until Company has obtained all necessary Regulatory Authorities' approvals required to sell Product in such territory. However, Hospira agrees to Manufacture and supply those quantities of Product requested in purchase orders by Company that are necessary to build Company's inventory in anticipation of commercial launch of the Product in a territory and Company shall, subject to Section 5.3(e) hereof, be required to pay for such Product irrespective of whether the Product ultimately receives all necessary Regulatory Authorities' approvals, unless such failure to obtain the necessary Regulatory Approval was solely caused by Hospira's failure to comply with cGMP.

5.3   Manufacture of Product.

(a) <u>Drug Substance</u>.  Hospira shall Manufacture Product for Company from Drug Substance that Company shall supply to Hospira at no cost.  Company shall supply Drug Substance to Hospira in quantities sufficient to satisfy Hospira's gross Manufacturing requirements of Product.  Hospira's use of Drug Substance received from Company shall be limited to development contemplated by this Agreement and the Manufacture of Product for Company in accordance with the terms and conditions of this Agreement.  Company shall deliver Drug Substance FOB Destination for deliveries originating in the United States, and D.D.P. (Incoterms 2000) for deliveries originating outside the United States, Hospira's Manufacturing plant McPherson, Kansas, pursuant to no-cost purchase orders that Hospira issues to Company.  Within fifteen (15) days of Hospira's receipt of any Drug Substance supplied by Company hereunder or any longer time period otherwise agreed by Company in advance thereof, Hospira shall (i) perform an identification test on the Drug Substance and confirm the shipment quantity, and (ii) notify Company of any inaccuracies with respect to quantity or of any claim that any portion of the shipment fails the identification test.  In the event Hospira notifies Company that the Drug Substance shipment does not conform to the Drug Substance Specifications or there is an inaccuracy in the shipment quantity, Company shall have the right to confirm such findings at Hospira's Manufacturing location.  If Company determines that such shipment of Drug Substance conformed to the Drug Substance Specifications, the parties shall submit samples of such shipment to a mutually acceptable independent laboratory for testing.  If such independent laboratory determines that the shipment conformed to the Drug Substance Specifications, Hospira shall bear all expenses of shipping and testing such shipment samples.  If Company or such independent laboratory confirms that such shipment did not meet the Drug Substance Specifications, Company shall replace, at no cost to Hospira, the portion of the Drug Substance shipment which does not conform to the Drug Substance Specifications and bear all expenses of shipping and testing the shipment samples.

(b) <u>Drug Substance Title</u>.  Company shall retain title to the Drug Substance while it is in the Hospira facility.  Subject to the limitation in <u>Section 5.3(c)</u>, Hospira shall assume responsibility and risk for the safekeeping, storage and handling for all shipments of Drug Substance delivered hereunder and accepted by Hospira.

(c) <u>Replacement of Drug Substance</u>.  In the event of any loss or damage of any Drug Substance delivered hereunder or the failure of Product to meet Product Specifications, Company shall supply to Hospira at no cost replacement Drug Substance according to the terms set forth in <u>Section 5.3(a)</u>. If any of the loss, damage or replacement of such Drug Substance results from a negligent act or omission by Hospira in the Manufacture, handling or storage of the Drug Substance or the Product (a "Negligent Loss"), Hospira shall reimburse Company for its cost of such Drug Substance in an amount equal to Company's standard cost/kg provided, however, in no event shall Hospira's liability for

7

reimbursement of Drug Substance due to Negligent Loss exceed Thirty Thousand U.S. Dollars ($30,000 USD) per occurrence. The consumption of Drug Substance for the Manufacture of Product, which shall be determined by comparing the amount of Drug Substance received by Hospira to the number of vials meeting Product Specifications Manufactured therefrom, shall be in accordance with the maximum consumption factors that Hospira and Company agree upon mutually in writing as promptly as practicable, which consumption factors are subject to change from time to time by mutual written agreement of the parties. If, during any Contract Year, consumption of Drug Substance (other than consumption due to a Negligent Loss) to produce a given quantity of Product exceeds the maximum agreed upon consumption factors by greater than five percent (5%) for such quantity of Product, Hospira shall promptly reimburse Company for any Drug Substance consumed in excess of five percent (5%) over the maximum agreed upon consumption factor at Company's standard cost for such excess amount of Drug Substance consumed (a "Consumption Loss"). Under no circumstances shall any quantity of Drug Substance damaged or lost as a result of a Negligent Loss be included in calculating whether there has been a Consumption Loss. In no event shall Hospira's aggregate liability for reimbursement of Drug Substance, due to any Negligent Loss and/or Consumption Loss, exceed Three Hundred Thousand U.S. Dollars ($300,000 USD) per Contract Year. This section states Company's sole remedy, and Hospira's sole liability, for any loss, damage, excessive consumption or misuse of Drug Substance.

(d) <u>Product Labeling</u>. Hospira shall label Product in accordance with label copy that Company provides. Such copy may be modified from time to time by agreement of the parties. Company shall reimburse Hospira for Hospira's actual costs of making any label copy changes and for the cost of any labeling that Hospira is unable to use due to such label copy changes.

(e) <u>Replacement of Nonconforming Shipment</u>. Notwithstanding the issuance of a Final Release, Company shall have a period of sixty (60) days from the date of its receipt of a shipment of Product (including Registration Batches) to inspect and reject such shipment for nonconformance with the Product Specifications. If Company rejects such shipment, it shall promptly so notify Hospira and provide to Hospira samples of such shipment for testing. If Hospira tests such shipment and determines that it did conform to the Product Specifications, the parties shall submit samples of such shipment to a mutually acceptable independent laboratory for testing. If such independent laboratory determines that the shipment conformed to the Product Specifications, Company shall bear all expenses of shipping and testing such shipment samples. If Hospira or such independent laboratory confirms that such shipment did not meet the Product Specifications, Hospira shall replace, at no cost to Company, that portion of the Product shipment which does not conform to the Product Specifications, and shall bear all expenses of shipping and testing the shipment samples. Any nonconforming portion of any shipment shall be disposed of as directed by Hospira, at Hospira's expense. Any Product that Company does not reject

pursuant to this Section 5.3(e) shall be deemed accepted, and all claims with respect to Product not conforming with Product Specifications shall be deemed waived by Company, except as to latent defects which are not reasonably discoverable, render the Product not conforming to Product Specifications, and are solely caused by Hospira.

(f) Materials. Hospira agrees that it shall only use Materials in the Manufacture of Product that have been previously approved by Company. If any such Material is from a supplier that is not a Hospira approved supplier then Company will be responsible for all costs associated with approving such supplier. In addition, if at any time after the Effective Date Company requests that Hospira obtain Materials from a different supplier(s), then Hospira shall have the right to revise the Price for the Product in order to account for any additional cost of obtaining the Materials from such different supplier(s). With the exception of printed packaging Materials, Hospira further agrees to maintain as safety stock, a minimum of one month inventory for all Materials. Company shall reimburse Hospira for Hospira's actual costs of any reasonable quantities of remnant safety stock unable to be used.

5.4     Person in the Plant. Hospira shall permit up to two (2) Company authorized representatives who are employees or independent contractors of Company or an Affiliate thereof ("Person in the Plant"), upon reasonable notice and during the normal business hours, or when Company's Product is in the process of Manufacture, to enter the production and quality control areas of the Facility used to Manufacture the Products in order to monitor the Manufacture of each Product and/or to examine production and quality control records relating to each Product, or as required to complete timely inspections of each Product's quality. Each Person in the Plant shall be subject to a confidentiality agreement, which shall be substantially similar to the confidentiality provisions within this Agreement, including but not limited to the provisions within Article 11 of this Agreement.

5.5     Dedicated Equipment Costs. The Parties acknowledge that Dedicated Product-Contact Equipment is required for the Manufacture of Product for Company. Company shall pay the cost of such equipment, subject to Company's prior approval of such costs, which approval shall not be unreasonably withheld. Hospira shall advise Company of specialized equipment required and the estimated costs associated with the purchase, installation and validation of such equipment. After Company approves such costs, Hospira shall install and validate the equipment and invoice Company for the associated costs. Company shall make payment to Hospira no later than forty-five (45) days upon Company's receipt of an invoice from Hospira, which invoice shall not be issued until after December 31, 2006. Title to the equipment shall be in Company's name. If Hospira wishes to use the Dedicated Product-Contact Equipment for manufacture of a product other than Product for Company, Hospira and Company shall meet and discuss the technical and practical ramifications of such use and appropriate compensation to Company; provided, however, Hospira shall not use such Dedicated Product-Contact Equipment for manufacture of a product other than Product for Company without Company's prior written consent. Hospira shall maintain the Dedicated Product-Contact Equipment in good working order, normal wear and tear excepted, during the Term of this Agreement at no additional cost to Company. Hospira shall assume all risk of loss to the Dedicated Product-Contact Equipment

while such Dedicated Product-Contact Equipment is in Hospira's possession or control, and at Company's written request, shall provide Company with written documentation in a form reasonably acceptable to Company of Hospira's ability to pay for such loss or self-insurance. After termination or expiration of this Agreement, Company or its designated Affiliate shall either: (a) pack such Dedicated Product-Contact Equipment and pay for shipping the Dedicated Product-Contact Equipment to Company's designated location; or (b) allow Hospira the option to purchase the Dedicated Product-Contact Equipment by paying Company or its designees a mutually agreed upon price for the equipment, taking into account the then-fair market value of the equipment. Hospira shall permit Company or its Affiliate, during normal business hours, reasonable access to the Hospira Facility to exercise either option.

5.6     Off-Site Waste.  If necessary, Hospira shall hire, direct and pay all costs for a waste contractor to remove all Waste from Hospira's Manufacturing facility for Product consistent with the Product's Material Safety Data Sheets ("MSDS").  The costs associated with the removal of Specially Regulated Waste shall be borne by Company.  Hospira shall obtain Company's written permission prior to the destruction and/or removal of any Specially Regulated Waste, and the destruction and/or removal of any equipment or materials (whether owned by Hospira or Company) relating to the Specially Regulated Waste.  Hospira shall document the destruction of any Specially Regulated Waste in writing and provide copies of such written documentation to an authorized representative of Company.  Hospira shall only dispose of Specially Regulated Waste at sites and through waste management vendors that have been approved in writing by Company, whose approval shall not be withheld unreasonably. Company maintains the right, but not the obligation, to witness the actual disposal of Specially Regulated Waste.  Hospira reserves the right to review the Product's MSDS.

5.7     Delivery.  Hospira shall deliver Product to Company, FOB origin, for deliveries within the United States, and EXW (Incoterms 2000), for deliveries outside of the United States, Hospira's Manufacturing plant at McPherson, Kansas or such other facility as may be agreed upon in writing by the parties. Title and risk of loss shall pass to Company at such point. Shipment shall be via a carrier designated by Company.  Company shall be the exporter of record.  Hospira shall make one shipment of sample Product plus up to two (2) shipments to Company of Product per batch at no charge to Company other than shipping costs.  All shipments of Product shall be packaged in a shipper case and shall be accompanied by a packing list.  Any other shipments requested shall be at a fee of One Thousand U.S. Dollars ($1,000 USD) per shipment plus shipping costs. The shipper case shall be labeled with any special storage conditions and Company's Product description, which shall be supplied by Company or its Affiliate to Hospira before shipment of any Product.

5.8     Price and Payment.

(a)  Price.  Hospira shall invoice Company for Product delivered by Hospira at the prices set forth on Exhibit 5.8.  Prices are firm through December 31, 2007. Beginning January 1, 2008 and on each succeeding January 1 during the Term hereof, prices may be increased by Hospira.  Price increases shall be effective for deliveries beginning January 1 of each calendar year.  Such increases shall not exceed the annual percentage increase for the most recent twelve (12) month period for which figures are available in the Product Price Index, Pharmaceutical

Preparations, Ethical (Prescription), commodity code PCU325412, issued by the Bureau of Labor Statistics, U.S. Department of Labor.

(b) <u>Annual Volumes and Price</u>. Should the delivered volume of Product be below 150,000 vials or exceed 800,000 vials in a calendar year, both Parties will meet to discuss in good faith the existing pricing referenced in <u>Exhibit 5.8</u> for possible adjustment, but any such price adjustment must be mutually agreed upon in writing by the parties.

(c) <u>Price</u>. Price includes the cost of all Materials as referenced in <u>Exhibit 5.8</u>.

(d) <u>Payment</u>. Hospira shall invoice Company upon shipment of Product. Company shall make payment net forty-five (45) days from the date of receipt of Hospira's invoice.

(e) <u>Taxes</u>. Any federal, state, county or municipal sales or use tax, excise, customs charges, duties or similar charge, or any other tax assessment (other than that assessed against income), license, fee or other charge lawfully assessed or charged on the Manufacture, sale or transportation of Product sold pursuant to this Agreement, and all government license filing fees and Prescription Drug User (PDUFA) annual establishment fees with respect to all Product shall be paid by Company.

(f) <u>Invoices</u>. All invoices for expenses and fees shall be submitted by Hospira to Company in an electronic format via the Johnson & Johnson Services, Inc. electronic invoicing system during the Term. All invoices must reference a valid Company purchase order and comply with all reasonable requirements of the electronic invoicing system.

(g) <u>Payment Denominations</u>. All payments to be made under this Agreement shall be made in United States dollars unless otherwise specified herein or agreed by the Parties in writing.

## Article 6. QUALITY

6.1    <u>Quality Control</u>. Hospira shall apply its quality control procedures and in-plant quality control checks consistent with cGMPs on the Manufacture of Product for Company in the same manner as Hospira applies such procedures and checks to products of similar nature manufactured for sale by Hospira, except to the extent such procedures and checks would conflict with the Quality Agreement. Hospira will test Product in accordance with the test methods set forth in <u>Exhibit 6.1</u>. Company will be responsible for performing all other tests as set forth in <u>Exhibit 1.16</u> necessary for Final Release. The parties may change the test methods from time to time by mutual agreement.

6.2    <u>Product Release</u>. Hospira shall supply copies of all Product documentation as required by the Quality Agreement to Company's or it's Affiliate's Manufacturing Quality

Assurance Department or any similar department of Company or such Affiliate. Company shall be responsible for issuing the Final Release.

6.3    Quality Agreement. The Quality Agreement is attached hereto as Exhibit 6.3.

6.4    Audit Right. Company shall have the right, upon sixty (60) days prior written notice to Hospira, to conduct, at its sole expense and during normal business hours, a quality assurance audit and inspection of Hospira's records and production facilities relating to the Manufacture of Product. Annual audits for the Product will be combined with other product and/or site audits conducted by Global Biologics Supply Chain, LLC when reasonably possible. Audits for the Product shall be conducted in accordance with the Quality Agreement. Any auditors shall be required to enter into confidentiality agreements with Hospira and Company containing terms of confidentiality substantially similar to those set forth in Article 11 hereof. Visits by Company to Hospira production facilities may involve the transfer of Confidential Information, and any such Confidential Information shall be subject to the terms of Article 11 hereof. The results of such audits and inspections shall be considered Confidential Information under Article 11 and shall not be disclosed to Third Parties, including, but not limited to, the FDA, unless required by law and only then upon prior written notice to Hospira. Hospira also agrees to allow the FDA to conduct any audit which the FDA requires and Hospira agrees to reasonably cooperate with the FDA in connection with such audit.

6.5    EHS and Insurance Audit Rights. In addition to its audit rights under Section 6.4 above, Company shall have the right, once every two (2) calendar years, to audit and inspect those portions of the Facility used in the Manufacture of the Product, for purposes related to insurance of the equipment and to determine Hospira's compliance with Section 12.12

6.6    Corrective Action Plans. If any audit under Section 6.4 or 6.5 above reveals that Hospira is not in compliance with its obligations under this Agreement, then Hospira and Company shall work in good faith to develop and implement a corrective action plan that both parties mutually agree upon in writing.

6.7    Notification of Complaints. Company shall notify Hospira promptly of any Product complaints involving Hospira's Manufacture in sufficient time to allow Hospira to evaluate the complaints and assist Company in responding to such complaints.

6.8    Product Recalls. In the event (a) any Regulatory Authority or other national government authority issues a request, directive or order that Product be recalled, (b) a court of competent jurisdiction orders such a recall, or (c) Company or Hospira reasonably determines that Product should be recalled, the parties shall take all appropriate corrective actions, and shall cooperate in any governmental investigations surrounding the recall. In the event that such recall results from the breach of Hospira's express warranties under Section 8.2(a) or (b) of this Agreement, Hospira shall credit (or if the Agreement has expired or terminated, refund) Company the Price Hospira invoiced for the Product recalled and returned, and Hospira shall reimburse Company for all reasonable recall expenses in connection therewith. In the event that the recall does not result from the breach of Hospira's express warranties under this Agreement, Company shall (a) be responsible for the expenses of the recall, (b) reimburse Hospira for the costs of any of Hospira's work in process affected by the recall, and (c) reimburse Hospira for any

costs reasonably expended by Hospira to assist Company to effect the recall. For purposes of this Agreement, the expenses of the recall shall include, but not be limited to, the expenses of notification and destruction or return of the recalled Product, cost of the recalled Product, and any costs associated with the distribution of the replacement Product, but shall not include lost profits of either party. The obligations of this <u>Section 6.8</u> shall survive the expiration or early termination of this Agreement for a period of one (1) year past the expiry date of the last batch of Product Manufactured pursuant to this Agreement.

Article 7.   O<small>RDERS AND</small> F<small>ORECASTS</small>

7.1    <u>Three Year Product Supply Forecast</u>. For capacity planning purposes, by January 1, 2007, Company shall provide Hospira with a written forecast of Company's annual requirements of Product for the first three calendar years. Thereafter, by September 15th of each calendar year Company shall update such rolling three-year forecast of its requirements of Product for the period commencing on January 1st of the next calendar year. Upon receipt of each rolling three-year estimate, Hospira shall within ninety (90) days, provide Company a written acceptance of the estimate and accordingly plan to allocate its annual capacity to Manufacture Product for Company, or a written rejection of the three-year forecast. Any such written acceptance shall constitute Hospira's Product supply commitment ("<u>Product Supply Commitment</u>") for each of the calendar years covered by the forecast. If Company issues, and Hospira accepts, a subsequent three-year forecast covering one or more previously covered calendar years, such subsequent forecast shall constitute Hospira's Product Supply Commitment for such calendar year(s). In the event Hospira rejects a three-year forecast, Hospira and Company shall meet as soon as possible to discuss in good faith the quantities of Product that Hospira could provide during each of the three calendar years covered by the forecast. Any such amount shall be agreed to in writing. Notwithstanding the foregoing, to the extent Hospira rejects a three year forecast, the Parties agree that the most recent previously accepted three year forecast shall continue to be Hospira's Product Supply Commitment for the years covered by such most recent previously accepted three year forecast.

7.2    <u>First Year Estimate</u>. Company shall, within sixty (60) days after filing its sNDA for Product, provide Hospira with a written estimate of Company's monthly requirements of Product to be supplied by Hospira for the first Contract Year. Hospira acknowledges that such quantities are estimates only and are nonbinding.

7.3    <u>First Order</u>. Hospira and Company shall cooperate fully in estimating and scheduling production for the first commercial order of Product to be placed by Company with Hospira in anticipation of regulatory approval of Manufacture of Product at the Facility.

7.4    <u>First Firm Order</u>. Company shall place its first firm order approximately three (3) months in advance of the anticipated Product regulatory approval date or desired Product availability date. At the same time, Company shall provide to Hospira Company's estimate of its monthly requirements of Product to be supplied by Hospira for the next succeeding nine (9) calendar month period.

13

7.5     Rolling Forecast. Thereafter, Company shall provide monthly to Hospira a rolling twelve (12) month projection of requirements of Product to be supplied by Hospira, with the first three (3) months of such projection being deemed the "Firm Period" for which Customer shall be bound to issue purchase orders in accordance with Section 7.7 and the remaining nine (9) months of such projection consisting of Company's best estimate forecast of its Product requirements ("Rolling Forecast"). Notwithstanding the foregoing, the Parties agree that each subsequent Rolling Forecast cannot change the prior Firm Period without mutual written agreement of both parties.

7.6     Minimum Purchase Requirement. Although Company covenants to purchase from Hospira Company's and its Affiliates' and the Licensees' total worldwide requirements of Drug for sale, Company further covenants to purchase from Hospira not less than one hundred percent (100%) of the number of units forecasted for months one (1) through three (3), seventy percent (70%) of the number of units forecasted for months four (4) through six (6), and fifty percent (50%) of the number of units forecasted for months seven (7) through twelve (12) of the most recent Rolling Forecast provided by Company under Section 7.5 (the "Minimum Purchase Requirement"). In lieu of Company taking delivery of the Minimum Purchase Requirement of Product, Company shall have the option to pay for its Minimum Purchase Requirement at the prices set forth in Exhibit 5.8 and waive Hospira's Manufacture and delivery obligations for Product. In the latter event, Hospira shall invoice Company for the amount payable, and Company shall pay Hospira within forty-five (45) days after receipt of Hospira's invoice.

7.7     Purchase Order and Purchase Order Acceptance. After providing the Rolling Forecast under Section 7.5, Company and Hospira shall work together to determine the filling schedule for the quantity of Product in the Firm Period. After the filling schedule has been determined, Company shall issue purchase orders for the amounts in the Firm Period. Within fourteen (14) days after receipt of Company's purchase orders for Product, Hospira shall confirm to Company its acceptance of the purchase order, delivery date and quantity of Product ordered by Company.

7.8     Best Efforts to Supply. Should Company order additional quantities of Product in a Contract Year in excess of forty percent (40%) over the Rolling Forecast which covers the entirety of such Contract Year, provided in accordance with Section 7.5, Hospira shall not be obligated to supply said additional quantities; provided, however, that Hospira shall, until Company's orders in the aggregate reach the applicable annual Product Supply Commitment, use reasonable commercial efforts to produce and deliver to Company said additional quantities within ninety (90) days of issuance of the purchase order for such additional quantities.

7.9     Firm Commercial Order Changes or Cancellations. If, due to significant unforeseen circumstances, Company requests changes that impact the Firm Period, Hospira shall attempt to accommodate the changes within reasonable Manufacturing capabilities and efficiencies. If Hospira can accommodate such change, Hospira shall advise Company of the costs associated with making any such change and Company shall be deemed to have accepted the obligation to pay Hospira for such costs if Company indicates in writing to Hospira that Hospira should proceed to make the change. If Hospira cannot accommodate such change, Company shall be bound to the original Firm Period. If Company cancels a purchase order,

Hospira shall be relieved of its obligation relating to such order but Company will not be relieved of its obligation of payment unless Hospira agrees to such cancellation in writing. If Company does not supply sufficient Drug Substance to Manufacture such order or acts in any other manner to effectively interfere with Hospira's ability to perform, Company shall remain liable for the full amount of the Firm Period regardless of whether such Product is Manufactured by Hospira or whether Company takes delivery of any such Manufactured Product. Notwithstanding anything to the contrary contained herein, all Product paid for by Company shall count toward the Minimum Purchase Requirement of Product including, without limitation, any payments made in the event of a cancellation.

     7.10    <u>Purchase Order Terms</u>. Each purchase order or any acknowledgment thereof, whether printed, stamped, typed, or written shall be governed by the terms of this Agreement and none of the provisions of such purchase order or acknowledgment shall be applicable except those specifying Product and quantity ordered, delivery dates, special shipping instructions and invoice information.

     7.11    Miscellaneous.

       (a) <u>Process Rework</u>. Process rework created as a result of Company's changes shall be billed separately at a reasonable fee mutually agreed upon in writing.

       (b) <u>Sub-lots</u>. Should Company desire Hospira to split a Manufacturing lot of Product into several sub-lots during packaging, there will be a split fee of Eight Thousand U.S. Dollars ($8,000 USD) for each sub-lot packaged.

       (c) <u>Cold Storage Fee</u>. A cold storage fee shall be due and payable to Hospira if Company stores Product at Hospira's plant in excess of four months after the Product's Final Release. The fee shall be One Thousand U.S. Dollars ($1,000 USD) per pallet per month or any part thereof.

     Article 8.   WARRANTIES; COVENANTS AND INDEMNIFICATION

   8.1   Company's Warranties.

       (a) Company represents and warrants to Hospira that all Drug Substance provided to Hospira pursuant to this Agreement shall, at the time of delivery, not be adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act, as amended, (the "<u>Act</u>") or within the meaning of any applicable state or municipal law in which the definitions of adulteration and misbranding are substantially the same as those contained in the Act, as the Act and such laws are constituted and effective at the time of delivery and will not be an article which may not under the provisions of Sections 404 and 505 of the Act be introduced into interstate commerce.

       (b) Company further warrants to Hospira that Drug Substance supplied to Hospira hereunder shall meet the Drug Substance Specifications set forth on <u>Exhibit 1.8</u>.

(c) Company further warrants that all specifications including Drug Substance Specifications and Product Specifications Company provides to Hospira shall conform to the appropriate sNDA (and other corresponding regulatory approvals in international markets from appropriate Regulatory Authorities) Company files with the appropriate Regulatory Authorities.

(d) Company further represents and warrants to Hospira that Company's performance of its obligations under this Agreement will not result in a material violation or breach of any agreement, contract, commitment or obligation to which Company is a party or by which it is bound and will not conflict with or constitute a default under its corporate charter or bylaws.

(e) Company further represents and warrants that it will not sell Product into any jurisdiction unless and until it receives the necessary Regulatory Authority approvals.

(f) Company further represents and warrants that it has the right to bind its Affiliates to the terms of this Agreement and that it shall be fully responsible for the acts and omissions of its Affiliates as if such acts and omissions were the acts and omissions of Company. Company represents and warrants that Global Biologics Supply Chain, LLC and Cenotcor, Inc. are Affiliates of Company as that term is defined in this Agreement.

8.2   Hospira's Warranties and Covenants.

(a) Hospira represents and warrants to Company that Product Hospira delivers to Company pursuant to this Agreement shall, at the time of delivery, not be adulterated or misbranded within the meaning of the Act or within the meaning of any applicable state or municipal law in which the definitions of adulteration and misbranding are substantially the same as those contained in the Act, as the Act and such laws are constituted and effective at the time of delivery and will not be an article which may not under the provisions of Sections 404 and 505 of the Act be introduced into interstate commerce.

(b) Hospira further represents and warrants to Company that Product Hospira delivers to Company pursuant to this Agreement shall be free from defects in material and workmanship and shall be Manufactured: (a) in accordance with and conformity with the Product Specifications; and (b) in compliance with all applicable statutes, laws, rules or regulations, including those relating to the environment, food or drugs and occupational health and safety, including, without limitation, those enforced or promulgated by the FDA, including, without limitation, compliance with cGMPs as defined herein.

(c) Hospira further represents and warrants to Company that Hospira's performance of its obligations under this Agreement will not result in a material violation or breach of any agreement, contract, commitment or obligation to which Hospira

is a party or by which it is bound and will not conflict with or constitute a default under its Certificate of Incorporation or corporate bylaws.

(d) Hospira covenants that it shall apply the quality control procedures and in-plant quality control checks on the Manufacture of Product for Company in accordance with the Quality Agreement, and in the same manner as Hospira applies such procedures and checks to products of similar nature manufactured for sale by Hospira except to the extent such procedures and checks would conflict with the Quality Agreement.

(e) Hospira covenants that it shall maintain in effect during the term of this Agreement any and all federal, state and/or local licenses, registrations and permits which may be required to be maintained by Hospira in order to Manufacture the Product hereunder.

(f) The foregoing warranties shall not extend to any nonconformity or defect which relates to or is caused by Drug Substance supplied by Company to Hospira; unless Hospira breaches its obligations for the identification test noted in Section 5.3(a), and such breach is the sole cause of such nonconformity or defect. Except as otherwise provided in Section 8.3 hereof, the replacement provisions of Sections 5.3(e) shall be Company's sole and exclusive remedy for nonconforming or defective Product.

(g) HOSPIRA MAKES NO OTHER WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO PRODUCT. ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE HEREBY DISCLAIMED BY HOSPIRA.

8.3   Indemnification by Hospira.   Hospira shall indemnify, defend and hold harmless Company, its Affiliates, officers, directors and employees (the "Company Indemnitees") from and against all claims, causes of action, suits, costs and expenses (including reasonable attorney's fees), losses or liabilities of any kind related to this Agreement and asserted by Third Parties to the extent such arise out of or are attributable to: (a) Hospira's breach of any representation or warranty set forth in this Agreement; (b) any violation of any proprietary right of any Third Party relating to Hospira's manufacturing processes used in the Manufacture of Product pursuant to this Agreement (excluding the Drug Substance Specifications, Product Specifications, Drug Substance, Drug or Product); or (c) any negligent or wrongful act or omission on the part of Hospira, its employees, agents or representatives and which relate to Hospira's performance hereunder. Hospira's indemnification obligations under this Section 8.3 shall survive expiration or termination of this Agreement until the last-to-expire of the longest statute of limitations governing any Third Party claims that could be brought against the Company Indemnitees for which Hospira would be required to indemnify the Company Indemnitees under the terms of this Section 8.3.

8.4   Indemnification by Company.   Company shall indemnify, defend and hold harmless Hospira, its Affiliates, officers, directors and employees (the "Hospira Indemnitees")

harmless from and against all claims, causes of action, suits, costs and expenses (including reasonable attorney's fees), losses or liabilities of any kind related to this Agreement and asserted by Third Parties to the extent such arise out of or are attributable to (a) Company's breach of any representation or warranty set forth in this Agreement; (b) any violation of any proprietary right of any Third Party relating to the Drug Substance Specifications, Product Specifications, Drug Substance, Drug or Product, other than Hospira's manufacturing processes used in the Manufacture of Product pursuant to this Agreement; (c) the use of or lack of safety or efficacy of Drug or Product; and (d) any negligent or wrongful act or omission on the part of Company, its Affiliates, employees, agents or representatives and which relate to Company's performance hereunder. Company's indemnification obligations under this <u>Section 8.4</u> shall survive expiration or termination of this Agreement until the last-to-expire of the longest statute of limitations governing any Third Party claims that could be brought against the Hospira Indemnitees for which Company would be required to indemnify the Hospira Indemnitees under the terms of this <u>Section 8.4</u>.

8.5     <u>Conditions of Indemnification</u>.  If any of the Hospira Indemnitees or Company Indemnitees seek indemnification from a party hereunder, it shall promptly give notice to the other party of any such claim or suit threatened, made or filed against it which forms the basis for such claim of indemnification and shall cooperate fully with the indemnifying party in the investigation and defense of all such claims or suits.  The indemnifying party shall have the option to assume the other party's defense in any such claim or suit with counsel reasonably satisfactory to the other party.  No settlement or compromise shall be binding on a party hereto without its prior written consent, such consent not to be unreasonably withheld.

8.6     <u>No Consequential Damages</u>. NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES RESULTING FROM ANY BREACH OF THIS AGREEMENT EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

Article 9.    INTELLECTUAL PROPERTY RIGHTS

9.1     <u>Hospira's Proprietary Rights</u>.  Hospira has granted no license, express or implied, to Company to use Hospira proprietary technology, know-how or rights relating to glass vials or its manufacturing process other than for the purposes of this Agreement.  If Hospira, in its sole discretion, deems patentable any improvement or invention related to Hospira's proprietary technology, know-how or rights relating to I.V. bags, glass vials, formulation of I.V. solutions or manufacturing processes made or reduced to practice in the course of this Agreement, then Hospira shall solely own and shall be entitled to apply for patent protection on such improvements or inventions at Hospira's expense and risk.

9.2     <u>Company's Proprietary Rights</u>.  Company has granted no license, express or implied, to Hospira to use Company's proprietary technology, know-how or rights relating to the Drug Substance, Drug or Product, other than for the purposes of this Agreement.  If Company, in its sole discretion, deems patentable any improvement or invention related to Company's proprietary technology, know-how or rights relating to the Drug Substance, Drug or Product

made or reduced to practice in the course of this Agreement, then Company shall solely own and shall be entitled to apply for patent protection on such improvements or inventions at its expense and risk.

Article 10.   TERM AND TERMINATION

10.1    Term.  This Agreement shall commence on the Effective Date and, unless earlier terminated as provided below, shall expire at the end of the fifth Contract Year (the "Initial Term").  Unless otherwise terminated in accordance with this Article 10, this Agreement shall be automatically extended for additional terms of one year, each, a "Renewal Term".  This Agreement may be terminated anytime after the Initial Term upon either party providing the other with at least twenty-four (24) months prior written notice of termination, which notice, for purposes of clarity, may be provided prior to the end of the Initial Term.  Hospira acknowledges and agrees that Company and its Affiliates and the Licensee's total worldwide requirements of Product shall not include Registration Batches Manufactured by Company, an Affiliate of Company or a third party on Company's behalf in an effort to qualify another facility as an approved manufacturing site for the Product during the twenty-four (24) month notice period.

10.2    Termination of Product Development Project.  Hospira may terminate the Project upon sixty (60) days prior written notice to Company if it determines in good faith that the Project is not technically feasible using commercially reasonable efforts.  If the Project is terminated, Hospira shall advise Company of Hospira's actual development costs on the Project incurred prior to such termination.  Company shall pay Hospira for all reasonable and documented development costs incurred to the date the termination notice is received that are consistent with Exhibits 2.1 and 3.1.

10.3    Failure to Obtain Regulatory Approval.  Hospira may terminate this Agreement by giving Company twenty four (24) months' prior written notice if the Product has not received FDA regulatory approval by September 1, 2008.

10.4    General Termination Rights.  Either party may terminate this Agreement as follows:

(a)    Immediately by providing written notice upon the bankruptcy or the insolvency of the other party; or

(b)    By giving to the other party sixty (60) days' prior written notice upon the breach of any warranty or any other material provision of this Agreement by the other party if the breach is not cured within sixty (60) days after written notice thereof to the party in default.

10.5    Hospira Termination.  If in any two (2) consecutive Contract Years Company waives Hospira's Manufacturing and delivery obligations pursuant to Section 7.6, Hospira may terminate this Agreement upon twenty-four (24) months prior written notice to Company.

10.6    Accrued Payment Obligations.  Upon termination pursuant to this Article 10, Company shall reimburse Hospira for Hospira's cost of all Materials purchased and on hand or

on order, if such supplies were reasonably ordered by Hospira based on firm purchase orders, or Company's estimates of its requirements of Product, and such Materials cannot be reasonably used by Hospira for other purposes or cancelled. Hospira shall invoice Company for all amounts due hereunder. Payment shall be made pursuant to Section 5.8.

10.7   Return of Inventory. In the event of any termination, Hospira shall promptly return (but in no event more than sixty (60) days after the expiration date or earlier termination of this Agreement) any remaining inventory of Drug Substance and Product to Company at Company's expense, unless such termination shall have been as a result of a breach of this Agreement by Hospira, in which case such inventory shall be returned at Hospira's expense.

10.8   Survival. Expiration or early termination of this Agreement shall not relieve either party of any obligations that it may have incurred prior to expiration or early termination and all covenants and agreements contained in this Agreement, which by their terms or context are intended to survive, will continue in full force and effect until for a period of one (1) year past the expiry date of the last batch of Product Manufactured pursuant to this Agreement unless a different time period is indicated in this Agreement or the Quality Agreement.

## Article 11.   CONFIDENTIAL INFORMATION

11.1   Nondisclosure. It is contemplated that in the course of the performance of this Agreement each party may, from time to time, disclose Confidential Information to the other. Hospira agrees that, except as expressly provided herein, it shall not disclose Confidential Information received from Company, and shall not use Confidential Information disclosed to it by Company, for any purpose other than to fulfill Hospira's obligations hereunder. Company agrees that, except as expressly provided herein, it shall not disclose Confidential Information received from Hospira, and shall not use Confidential Information disclosed to it by Hospira, for any purpose other than to fulfill Company's obligations hereunder.

11.2   Exceptions to Duty of Nondisclosure. Notwithstanding the above, nothing contained in this Agreement shall preclude Company or Hospira from utilizing Confidential Information as may be necessary in prosecuting patent rights of either party pursuant to Article 9, obtaining governmental marketing approvals, Manufacturing Product pursuant to the terms and conditions of this Agreement, or complying with other governmental laws and regulations or court orders (provided that the Receiving Party to the extent possible gives notice to the Disclosing Party so that the Disclosing Party shall have the opportunity to apply for confidential treatment of such Confidential Information, except as required to file and prosecute such patent applications).

11.3   Public Announcements. Neither party shall make any public announcement concerning the transactions contemplated herein, or make any public statement which includes the name, trademark, logo, symbol or other image of the other party or any of its Affiliates, or otherwise use the name, trademark, logo, symbol or other image of the other party or any of its Affiliates in any public statement or document, except as may be required by law or judicial order, without the written consent of the other party, which consent shall not be unreasonably withheld. Subject to any legal or judicial disclosure obligation, any such public announcement proposed by a party that names the other party shall first be provided in draft to the other party.

11.4   Injunctive Relief. The parties acknowledge that either party's breach of this Article 11 may cause the other party irreparable injury for which it would not have an adequate remedy at law. In the event of a breach, the non-breaching Party may be entitled to seek injunctive relief in addition to any other remedies it may have at law or in equity.

11.5   Return of Documents. Each Receiving Party shall arrange for the prompt (but in no event more than sixty (60) days after the expiration date or earlier termination of this Agreement) destruction or return to the Disclosing Party (at the Disclosing Party's option) of all Confidential Information and any and all other documentation relating to the Confidential Information of the Disclosing Party.

11.6   Survival of Confidentiality Obligations.     The obligations of the parties relating to Confidential Information under Article 11 shall expire ten (10) years after the expiration or termination of this Agreement.

Article 12.   MISCELLANEOUS

12.1   Force Majeure and Failure of Suppliers.

(a)   Excusable Delay. Any delay in the performance of any of the duties or obligations of either party hereto (except the payment of money) shall not be considered a breach of this Agreement and the time required for performance shall be extended for a period equal to the period of such delay, provided that such delay has been caused by or is the result of any acts of God, acts of the public enemy, insurrections, riots, embargoes, labor disputes, including strikes, lockouts, job actions, boycotts, fires, explosions, floods, shortages of material or energy, or other unforeseeable causes beyond the control and without the fault or negligence of the party so affected. The affected party shall give prompt notice to the other party of such cause, and shall take promptly whatever reasonable steps are necessary to relieve the effect of such cause.

(b)   Transfer of Production. If Hospira becomes subject to an event of force majeure which interferes with production of Product at Hospira's Facility, the parties shall mutually agree on implementation of an agreed-upon action plan to transfer production of Product to another Hospira plant. The parties shall, after the execution of this Agreement and at the request of either party, meet to discuss and define such an action plan.

(c)   Termination. If the conditions of force majeure affecting a Party extend beyond a time period of six (6) months without the ability to implement a plan to circumvent the conditions that are acceptable to the non-affected Party, the non-affected Party may terminate this Agreement upon thirty (30) days prior written notice to the affected Party.

(d) <u>Failure of Suppliers</u>.  The parties understand and agree that Company has chosen the excipient and primary container packaging component suppliers listed in the Product Specifications. Under no circumstances shall Hospira have any liability to Company, nor shall Hospira be deemed to be in breach of this Agreement, if Hospira is unable to supply Product to Company due to a failure of such suppliers to provide such excipients and/or primary container packaging components to Hospira; provided, such failure is not due to the fault or negligence of Hospira.

12.2    <u>Notices</u>.  All notices hereunder shall be delivered as follows: (a) personally; (b) by facsimile and confirmed by first class mail (postage prepaid); (c) by registered or certified mail (postage prepaid); or (d) by overnight courier service, to the following addresses of the respective parties:

If to Company:

GBSC
200 Tournament Drive
Horsham, PA 19044
Attention: General Manager, Contract
Manufacturing
Facsimile: (215) 325-4151

With a copy to:

GBSC
200 Tournament Drive
Horsham, PA 19044
Attention: Associate Director, Contract
Manufacturing
Facsimile: (215 325-4151)

If to Hospira:

Hospira, Inc.
Attention: VP GM Contract Manufacturing
Services
275 North Field Drive
Lake Forest, Illinois 60045
Attn:
Facsimile:

With copy to:

Hospira, Inc.
Attention: General Counsel
Building H1; Department NLEG
275 N. Field Drive
Lake Forest, IL 60045
Fax: 224-212-2086

Notices shall be effective upon receipt if personally delivered or delivered by facsimile and confirmed by first class mail, on the third business day following the date of registered or certified mailing or on the first business day following the date of or delivery to the overnight courier. A party may change its address listed above by written notice to the other party.

12.3    <u>Choice of Law</u>.  This Agreement shall be construed, interpreted and governed by the laws of the State of Delaware, excluding its choice of law provisions. The United Nations Convention on the International Sale of Goods is hereby expressly excluded. The Parties hereby agree that any and all claims arising out of or related to this Agreement shall only be brought in

the courts in the State of Delaware, and each Party on behalf of itself and its Affiliates consents to the jurisdiction of such courts.

12.4    Senior Executive Meeting. In the event any dispute shall arise between the Parties with respect to any of the terms and conditions of this Agreement, then the Vice President & General Manager, Contract Manufacturing Services of Hospira and an executive designated by Cilag, or an authorized equivalent corporate officer, shall meet as promptly as practical after the notice of such dispute to attempt to resolve such dispute on a good faith basis.

12.5    Assignment. Neither party shall assign this Agreement nor any part thereof without the prior written consent of the other party, which consent will not be unreasonably withheld; provided, however either party may assign this Agreement to one of its wholly-owned subsidiaries or its parent corporation without such consent. Any permitted assignee shall assume all obligations of its assignor under this Agreement. No assignment shall relieve any party of responsibility for the performance of any accrued obligation which such party then has hereunder. This Agreement shall be a binding obligation of the successors and permitted assigns of each Party hereto.

12.6    Entire Agreement. This Agreement, together with the Exhibits referenced and incorporated herein, constitute the entire agreement between the parties concerning the subject matter hereof and supersede all written or oral prior agreements or understandings with respect thereto. Notwithstanding anything to the contrary in this Agreement or in any other document or agreement, in the event of a conflict between this Agreement and the Quality Agreement, this Agreement shall govern and control as to quality matters.

12.7    Severability. This Agreement is subject to the restrictions, limitations, terms and conditions of all applicable governmental regulations, approvals and clearances. If any term or provision of this Agreement shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other term or provision hereof, and this Agreement shall be interpreted and construed as if such term or provision, to the extent the same shall have been held to be invalid, illegal or unenforceable, had never been contained herein.

12.8    Waiver-Modification of Agreement. No waiver or modification of any of the terms of this Agreement shall be valid unless in writing and signed by authorized representatives of both parties. Failure by either party to enforce any such rights under this Agreement shall not be construed as a waiver of such rights, nor shall a waiver by either party in one or more instances be construed as constituting a continuing waiver or as a waiver in other instances.

12.9    Insurance Clause. Hospira will procure and maintain, at its own expense, for the duration of the Agreement, and for five (5) years thereafter if written on a claims made or occurrence reported form, the types of insurance specified below with carriers rated A- VII or better with A. M. Best or like rating agencies:

a.  Workers' Compensation in accordance with applicable statutory requirements and where permitted by law, shall provide a waiver of subrogation in favor of Company.

23

b. Employer's Liability with a limit of liability in an amount of not less than $500,000;

c. Commercial General Liability including premises operations, products & completed operations, blanket contractual liability, personal injury and advertising injury including fire legal liability for bodily injury and property damage in an amount not less than $1,000,000 per occurrence and $2,000,000 in the aggregate;

d. Commercial Automobile Liability for owned, hired and non-owned motor vehicles with a combined single limit in an amount not less than $1,000,000 each occurrence;

e. Excess Liability including products liability with a combined single limit in an amount of not less than $25,000,000 per occurrence and in the aggregate;

f. Commercial Crime or Fidelity Bond in an amount of not less than $5,000,000 per occurrence and in the aggregate including an endorsement for third party liability without the requirement of a conviction.

g. All risk property insurance covering Hospira property in an amount not less than the full replacement cost of such property.

Hospira shall include Company and its Affiliates, directors, officers, employees and agents as additional insureds with respect to Commercial General Liability, Commercial Automobile Liability and Excess Liability but only as respects the liabilities assumed by Hospira. Prior to commencement of services, and annually thereafter, Hospira shall furnish to Company certificates of insurance evidencing any self-insured retentions and the insurance coverages stated above and shall require at least thirty (30) days written notice to Company prior to any cancellation, non-renewal or material change in said coverage. In the case of cancellation, non-renewal or material change in said coverage, Hospira shall promptly provide to Company a new certificate of insurance evidencing that the coverage meets the requirements in this Section. Hospira may, at its option, satisfy, in whole or in part, its obligation under this Section through its self- insurance program. If Hospira chooses to self-insure, then Hospira must indemnify Company to the same extent as an additional insured would be in a traditional insurance policy.

Company will procure and maintain, at its own expense, for the duration of the Agreement, and for five (5) years thereafter if written on a claims made or occurrence reported form, the types of insurance specified below:

h. Workers' Compensation in accordance with applicable statutory requirements and where permitted by law, shall provide a waiver of subrogation in favor of Hospira.

i. Employer's Liability with a limit of liability in an amount of not less than $500,000;

j. Commercial General Liability including premises operations, personal injury and advertising injury including fire legal liability for bodily injury and property damage in an amount not less than $1,000,000 per occurrence and $2,000,000 in the aggregate;

k.  Commercial Automobile Liability for owned, hired and non-owned motor vehicles with a combined single limit in an amount not less than $1,000,000 each occurrence;

l.  Product Liability with a limit of liability in an amount of not less than $25,000,000 per claim and in the aggregate and shall remain in effect for 2 years after the expiration of said Agreement;

m.  All risk property insurance covering Company property in amount not less than the full replacement cost of Company's property.

Company shall include Hospira and its Affiliates, directors, officers, employees and agents as additional insureds with respect to Commercial General Liability, Commercial Automobile Liability and Excess Liability but only as respects the liabilities assumed by Company. Company shall furnish to Hospira certificates of insurance evidencing the insurance coverages stated above and shall require at least thirty (30) days written notice to Hospira prior to any cancellation, non-renewal or material change in said coverage. In the case of cancellation, non-renewal or material change in said coverage, Company shall promptly provide to Hospira a new certificate of insurance evidencing that the coverage meets the requirements in this Section. Company may, at its option, satisfy, in whole or in part, its obligation under this Section through its self- insurance program. If Company chooses to self-insure, then Company must indemnify Hospira to the same extent as an additional insured would be in a traditional insurance policy.

12.10  Exhibits.  All Exhibits referred to herein are hereby incorporated by reference.

12.11  Debarment Warranty.  Hospira and Company represent and warrant that neither party uses nor will use in the future use in any capacity the services of any person debarred under Section (a) or (b) of 21 U.S.C. Section 335a.

12.12  Additional Terms.  If not already dealt with by the terms of this Agreement, the Parties agree to comply with the additional terms incorporated in Exhibit 12.12 incorporated by reference as if set forth fully herein, where in reference to Contractor are deemed to mean Hospira and references to GBSC are deemed to mean Company.

12.13  No Subcontracting.   Hospira shall not subcontract any of its material Manufacturing obligations hereunder without the prior written consent of Company, which consent shall not be unreasonable withheld.

12.14  Remedies.  Except as expressly set forth in this Agreement, none of the remedies set forth in this Agreement are intended to be exclusive, and each party shall have available to it all remedies available under law or in equity.

12.15  Conflicting Terms. In the event of a conflict between the provisions contained in this Agreement and in any Exhibit hereto, the terms of this Agreement shall prevail over the Exhibit, except to the extent such Exhibit specifically states that one of its provisions supersedes a similar provision of this Agreement.

12.16  Mutual Drafting. This Agreement is the joint product of Hospira and Company and each provision hereof has been or shall be subject to the mutual consultation, negotiation and agreement of the Parties and their respective legal counsel and advisors, and any rule of construction that a document shall be interpreted or construed against the drafting Party shall not be applicable.

IN WITNESS WHEREOF, the parties intending to be bound by the terms and conditions hereof have caused this Agreement to be signed by their duly authorized representatives as of the date first above written.

HOSPIRA WORLDWIDE, INC.

By: _____

Name: _Thomas G. Moore_

Title: _President_
_Global Pharmaceuticals_

CILAG GmbH INTERNATIONAL

By: _____

Name: _Heinz  Schmid_____

Title: _General Manager_____

CILAG GmbH INTERNATIONAL

By: _____

Name: _Gilbert Eyer_____

Title: _Finance Director_____

26

Exhibit 1.8

## Drug Substance Specifications

| Test | Method | Specification |
|---|---|---|
| Appearance | Physical examination | Integrity of 1 L polycarbonate bottles of frozen (-40°C or lower) Material. |
| Identification | SEC-HPLC | Matches Reference Standard |
| Shipping Conditions | Download and Review TempTale information | Conforms to specification. Verify the temperature of the shipment was maintained at ≤ -40°C throughout the shipment. Round all values to the nearest whole number. Exceptions to Out of Specification values: A. Disregard out of specification values captured on the start-up of the shipment due to equilibration of the temperature. B. Disregard temporary out of specification values less than 30 minutes due to movement between cold or warm area in the external environment or door openings. |
| Certificate of Analysis/ Release Statement | Review C of A | Must include: Centocor lot number Centocor part number Expiry date Centocor QA signature |
| Note: Acceptance based on Certificate of Analysis or Release Authorization supplied by Centocor/GBSC and performance of Appearance, Identity and conformance of shipping conditions. | | |

Exhibit 1.16

Product Specifications

| Test or Attribute | Release Acceptance Criteria |
|---|---|
| Color of Flip off | White |
| Color/Appearance | Colorless, Clear Liquid |
| Particles | Proteinaceous particles conform to picture A or B |
| PH | 7.0 to 7.4 |
| Protein Concentration by OD 280 | 1.90 to 2.10 mg/ml |
| Charge Heterogeneity by IEF | $\Delta$pI of the 8.1 and 8.3 (main band) between Reference Standard and sample $\leq 0.05$<br><br>The % IOD of main band of the test sample must be $\geq 90$% of the total IOD of all bands in that lane |
| Identity by DRID | Reacts with anti-human IgG (H+L) and with c7E3 anti-idiotype.<br><br>No reaction with anti-human IgG (Fc) or anti-murine IgG (Fc) |
| Purity by SDS-PAGE – Non-reduced | Conforms to Reference Standard:<br><br>IOD ratio Fab sample relative to Reference Standard, (using the 1:243 dilution), must be between 0.8 and 1.2<br><br>IOD ratio minor bands with IOD>1/10 IOD of Fab band of Reference Standard (1:243 dilution) must be $\leq 3.5$<br><br>Additional bands must have an IOD $<$ the IOD of Fab band of Reference Standard in 1:243 dilution |
| Purity – GF-HPLC | $\leq 98$% as monomer<br><br>(monomer + aggregate = 100%) |
| Identity – GF-HPLC | $\leq 0.1$ min retention time difference between sample and reference standard |
| Hydrophobic Interaction HPLC (HIC) | Main Peak $\geq 97$% |
| Immunoreactivity by EIA | 90 –110% activity of reference standard |
| Endotoxin by LAL | $\leq 1.6$ EU/ml |
| Platelet aggregation (Biological activity) | 87 – 115% activity of Reference Standard |
| Identity Phosphate[a] | Pass Test |
| Identity Sodium[a] | Pass Test |
| Identity Chloride[a] | Pass Test |

28

| Identity Polysorbate 80 (Tween)[a] | Pass Test |
|---|---|
| Sterility | No Growth |
| Fill Volume | 5.3 to 5.8 mL |

[a] Excipient testing is not required for all destinations.

Exhibit 2.1

Project Development Activities

**Initial Product Review** -Estimated Completion Date: 2Q/2006
Creation of a joint project team, Kick-off meeting, identification of project needs, project
scoping, creation of project plan, timeline, financials and the like.

**Formulation, Analytical Method Development and Documentation**
Estimated Completion Date: 2Q/2007
Expected studies in this tech transfer and method development area are analytical method
transfer (1), contact studies, develop, validate and conduct cleaning studies, AMC/YM, BET
Method Validation, B/F, container closure studies, USP Rubber Testing, etc., along with all
necessary documentation related to primary and secondary packaging components, generation of
batch records for compounding, filling, and packaging, in-process and final release Product
Specifications.

**Registration Batch Production, Testing and Process Validation**
Estimated Completion Date: 2Q/2007
Expected activities are the creation of a New Product Validation Plan (PVP) along with the
execution of the PVP. Validations expected to be conducted are media fills (3x), cleaning
validation (3x), hold time studies (3x), mix time (3x), fill uniformity, filter sterilization, etc.

**Preapproval Submission (PAS) Preparation**
Estimated Completion Date: 3Q/2007
This includes Hospira's full regulatory support and reports. Prepare and review CMC section of
submission, deficiency responses, PAI, etc.

**Final Package Development, Documentation Revision/Commercialization**
Estimated Completion Date: 4Q/2008
Upon approval finalize final bulk package, prepare final documentation, batch records, etc.

**Capital Equipment**
The following Dedicated Product-Contact Equipment is expected for the Program:  Dedicated
tanks (provided by Company at no charge to Hospira), ten 6 mL filling pumps, one solution
reservoir, one solution manifold, ten fill needles, miscellaneous Sensol probes, adaptors, etc.

**Plant Runs**
In addition to the foregoing, it is estimated that three (3) registration/validation runs and up to
two (2) Engineering runs will be needed. The costs of such runs shall be in accordance with
Section 5.8 of the Agreement.

The joint Project Team will determine the final needs and timeline of the Program.  Company
will only be charged for those activities that are actually performed, which in no event shall
exceed the estimates set forth on Exhibit 3.1 without the prior written approval of Company, plus
the cost of any registration, validation, and engineering runs.  Additional activities the Project

Team determines are needed which are beyond the activities noted above will be agreed upon in accordance with <u>Section 3.2</u> of the Agreement.

Exhibit 3.1

Payment Schedule

Payment of the Development Fee shall be within forty-five (45) days of receipt of invoice in accordance with the following payment schedule:

(a) Thirty Nine Thousand and Seventy Two U.S. Dollars (US $39,072) upon execution of this Agreement and completion of the Initial Product Review;

(b) One Hundred Forty Thousand and Six Hundred Twenty U.S. Dollars (US $140,620) after Hospira completes the Formulation, Analytical Method Development, and Documentation Activities;

(c) Three Hundred Thirty Eight Thousand and Fifty Two U.S. Dollars (US $338,052) upon completion of the Registration Batch Production, Testing and Process Validation Activities;

(d) Ninety Six Thousand and Three Hundred Eighty Eight U.S. Dollars (US $96,388) upon completion of the Preapproval Submission (PAS) Preparation Activities;

And

(e) Twenty Two Thousand and Four Hundred Fifty Six U.S. Dollars (US $22,456) upon completion of the Final Package Development, Documentation Revision/Commercialization Activities.

Note: Development activities may take place and be completed during 2006. Notwithstanding the foregoing, it is agreed that Hospira shall not invoice Company for such Development Fees prior to January 1, 2007. The cost of Dedicated Product Contact Equipment for the Project is estimated as of the Effective Date not to exceed a total of One Hundred Thousand Dollars (US $100,000), excluding tanks provided by Company at no charge to Hospira, without the prior written approval of Company.

Exhibit 5.8

## Product Prices

| Product | Intermediate Package | Price per Vial | Market |
|---|---|---|---|
| ReoPro® Domestic | Full Commercial Packaging | $3.99 | Domestic* |
| ReoPro® International | Bulk Pack | $3.99 plus cost of cold chain packaging | Outside US** |

\*    Price includes labeling and packaging for commercial sale.
\*\*   Price includes bulk packaging in nude vials.

Exhibit 6.1

Product Test Methods

| Test or Attribute | Release Acceptance Criteria | Performed By |
|---|---|---|
| Sterility - membrane filtration | No Growth | Hospira |
| Endotoxin by LAL | $\leq 1.6$ EU/mL | Hospira |
| Fill Volume - gravimetric | 5.3 to 5.8 mL | Hospira |

Exhibit 6.3

Quality Agreement

*(See attached.)*

**Exhibit 12.12**



GLOBAL BIOLOGICS SUPPLY CHAIN, LLC

## **Letter of Understanding**

The purpose of this letter is to confirm the parties understanding with respect to Contractor's activities under the Agreement as outlined below.

(a) Contractor will comply with all applicable safety, health and environmental laws and regulations issued by national, state and local authorities.

(b) Contractor will inform GBSC promptly of any significant adverse event (e.g., fires, explosions, accidental discharges) and of any serious health effects or fatalities that have a material affect on Contractor's activities under the Agreement.

(c) Contractor will inform GBSC promptly of any material findings of violations of applicable safety, health and environmental laws or regulations.

(d) Contractor will permit, upon reasonable notice, representatives of Johnson & Johnson to observe the manufacturing process.

(e) Contractor will abide by Johnson & Johnson's Policy on the Employment of Young Persons (Attachment 1) in the manufacture of products for Johnson & Johnson. Contractor shall maintain the records necessary to demonstrate compliance with such Policy on the Employment of Young Persons and shall provide GBSC a written certification of such compliance, if requested. If Contractor fails to comply with this provision, GBSC shall provide written notice to Contractor of its failure to comply. Contractor shall have 30 days from the date of written notice to comply or demonstrate

## Exhibit 12.12 Continued

compliance with the Policy.  If Contractor fails to comply or demonstrate compliance after 30 days, GBSC and the Contractor shall meet to determine a
collaborative course forward.

(f) Where there are no laws or regulations covering the following subjects, Contractor represents that to best of its knowledge:

(1) Air Pollution.  Extremely toxic air pollutants are not emitted in quantities that harm human health or the environment.

(2) Wastewater.  Wastewater discharges directly to a water body (stream, lake, and marsh) or onto the ground do not adversely impact human health or the environment.

(3) Hazardous Waste.  Hazardous waste is sent to off-site facilities that are licensed by the government to manage this type of waste.

(4) Toxic Chemical Management.  Toxic chemicals and petroleum products (oil) are managed in a manner that minimizes the likelihood of a catastrophic incident.

(5) Environmental Contamination.  If significant environmental contamination exists, the facility takes measures to remediate (cleanup) the contamination. Also, the facility cooperates with the environmental regulatory agency to resolve all such situations.

(6) Regulatory Violations.  The facility does not have a history of chronic violations of environmental regulations.

(7) Risk Assessment and Safety Inspections.  A proactive process is in place to identify and correct workplace hazards;

(8) Safety Procedures.  Procedures exist to ensure the safe operation of machinery and equipment;

(9) Personal Protective Equipment.  Protective clothing and equipment is provided to employees to prevent overexposure to hazardous substances;

37

## Exhibit 12.12 Continued

(10) Training.  Instruction is provided to employees to ensure they
are aware of workplace hazards and the means to protect them from
injury;

(11) Accident Investigations.  All accidents and injuries are
investigated to identify and eliminate root causes; and

(12) Emergency Response Plans.  Written procedures are maintained
to address emergencies such as evacuations, fires, chemical spills,
and medical emergencies and all affected employees are trained on
those procedures.

Hospira, in this document identified as Contractor, herewith agrees and
accepts to adhere to the above requirements as a condition for doing
business with GBSC.

This _Oct_ day of _25_ , 2006

_Dennis Lowry_
Signature

_Dennis Lowry_      _Dir. of EHS_
Name and title

38